Louis A. BALL, Movant,

v.

E.W. SCRIPPS COMPANY, the Kentucky Post and Al Salvato, Respondents.

No. 87–SC–826–DG.

Supreme Court of Kentucky.

Nov. 29, 1990.

Frank V. Benton, III, Benton, Benton & Luedeke, Fort Thomas, for movant.

Richard G. Meyer, Deters, Benzinger & Lavelle, Covington, for respondents.

LEIBSON, Justice.

This is a libel action brought by a public official, Louis A. Ball, Commonwealth Attorney for Campbell County, against The Kentucky Post, a daily newspaper serving the Northern Kentucky area, and Al Salvato, the reporter for the Post who wrote the articles at issue. The case for libel was made primarily on the basis of a two-part series, "Portrait of a Prosecutor," appearing in The Kentucky Post on November 17 and 19, 1984.

The case was tried in November, 1985. Under the instructions submitted, a jury found statements in these articles were false and defamatory, and motivated by actual malice as properly defined in the jury instructions, and awarded Ball compensatory damages in the sum of $175,000. The jury was instructed on punitive damages, but made no punitive award. The newspaper appealed to the Kentucky Court of Appeals where the case was reversed and dismissed in August, 1987, by a divided court (2–1), the majority holding "there is no clear and convincing evidence that these articles were published with the requisite

knowledge of falsity or reckless disregard for the truth necessary to remove them from constitutional protection." We accepted Discretionary Review and first heard oral arguments in June, 1988. We then decided to abate a final decision because the decision of the U.S. Sixth Circuit Court of Appeals in *Connaughton v. Harte–Hanks Communications, Inc.*, 842 F.2d 825 (6th Cir.1988), a case similar in many respects to the present case, had been accepted for review by the United States Supreme Court. Its decision is reported in *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). After the *Connaughton* case was decided by the U.S. Supreme Court, we heard rearguments in the present case in June, 1990, and reconsidered the case. Based on the law of libel in Kentucky, as constrained by the decisions of the United States Supreme Court regarding the First Amendment protection of freedom of the press, including the mandate that appellate judges in such cases "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity [*Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 514, 104 S.Ct. 1949 [1967] 80 L.Ed.2d 502 (1984)]," we reverse the Court of Appeals and reinstate the judgment of the trial court.

■ The prominence of the defamatory material displayed in the articles in question can only be appreciated by viewing the newspapers as printed. "Portrait of a Prosecutor" is the lead story on the front page in both the November 17th and 19th newspapers, accompanied by oversized subheadings, photographs and graphs, all of dramatic quality.

The major sub-headline in the November 17 article is styled "Lou Ball's Record Lags Behind Others." There are graphs with statistical comparisons between Ball's Campbell County performance and neighboring Kenton County, very unfavorable to Ball. One graph is labeled in bold print, "Persistent Felony Offender Rates," and the second is labeled in equally bold print, "How Felony Cases Are Handled."

The large, bold-faced subheading on the November 19 article is styled "Serious Gap With The Police." Again Ball's picture is prominently displayed, this time accompanied by an equally prominent picture of "former narcotic officer David Patchell," with a statement from Patchell:

> "He turns them right back, and they commit crime after crime. They couldn't have a better friend."

There is also a comment from Ball next to his picture,[1] but the comment has little impact in offsetting the overall defamatory character of the article. There is a second article on page two in the November 19 edition, headlined "Ball's Record On Plaza Bingo and Cinema X," which is derogatory, but hardly defamatory. Its significance in this case relates only to the malice which can be inferred from the heavy handed way in which it was written.

There were also two editorials in the newspaper, one dated July 2, 1984, headlined "The Real Crime in Bellevue," and a second dated November 26, 1984, headlined "Our Challenge to Lou Ball," which are derogatory to Ball but not in themselves false and defamatory. The first accuses Ball of mishandling a Campbell County grand jury investigation into the Bellevue Police Department, and the second, generally critical of the way Ball performed his office, calls on "Mr. Ball to improve his record," and suggests:

> "An unhappy public could ask him to resign, but the public might be better served if it looked to Mr. Ball's promise."

The material within these two editorials relates almost exclusively to expressions of opinion, although there are isolated references which are arguably false statements of underlying facts. The primary, if not the exclusive, purpose of the editorials is as evidence of bias or hostility against Ball, which, standing alone, would not suffice to prove actual malice against Ball, but which lends credence to other circumstances which the appellant asserts as proof of

---

1. "If there is a problem, it's that the police do not follow up their investigations."

actual malice. Some of these other circumstances are:

1) Evidence that the newspaper reporter, Salvato, bore a grudge against some members of the Bellevue Police Department because of an incident occurring at a high school football game in Bellevue, Kentucky, during 1982, a grudge which he extended to Ball when he did not pursue charges against the Bellevue Police Department vigorously enough to suit Salvato. In 1982, Salvato was researching the topic of drug use among young persons in Northern Kentucky. According to the testimony of Officer Joe Chandler of the Bellevue police department, he was called to investigate a report that "Al Salvato was trying to get some girls to take some dope with him because he was depressed." Salvato was not arrested for this incident after he advised the police officer that "he was working for The Kentucky Post and that he had permission from Judge Kopowsky to be there to do this." Nevertheless, at the request of the school, Salvato was made to leave the game.

Salvato and the Post then published a number of stories concerning alleged police irregularities in Bellevue. The Kentucky State Police conducted an investigation of the Bellevue police department the early part of 1984. The State Police compiled and submitted a report to the Campbell County Grand Jury regarding the Bellevue police, but the Grand Jury returned no indictments. It was shortly thereafter that the July 2, 1984 Post editorial appeared criticizing Ball, whom the newspaper referred to as timid. Following the Grand Jury's report, the Post decided to take an in-depth look at Ball and his office. Based on these facts, Ball claims the jury had reason to believe Salvato was motivated to "get" Lou Ball.

2) In the investigation into the conduct of Lou Ball's office that followed, beginning in July 1984, Salvato reviewed Campbell Circuit Court Clerk's records to compile records regarding case disposition. Ball cites as evidence that Salvato acted with malice in his heart that when he would come to a case where a felony charge was reduced to a misdemeanor or a persistent felony offender charge was dismissed, Salvato would mark "good case" in his notes.

3) Salvato selectively interviewed only a few persons hostile to Ball as background material for his news articles, deliberately choosing not to interview those who could contradict their claims. For instance, he interviewed a convicted felon who claimed he was forced to plead guilty in exchange for dropping a persistent felony offender charge against him, but not the felon's lawyer. For further example, in investigating the background for Kenton County statistics, instead of talking to the person who was the Commonwealth's Attorney for the years in question (1979–84), he interviewed an Assistant currently seeking election to the position. The movant produced evidence Salvato knew the Kenton County system for negotiating in felony cases was different from the Campbell County system in that persistent felony offender charges were reduced before the case went to the Grand Jury in Kenton County and not in Campbell County, Salvato told his editor that cases were handled differently in Campbell County from Kenton County, but Salvato ignored this difference in the newspaper article of November 17, 1984, when he reported the comparison in statistics between Kenton and Campbell Counties.

4) The defamatory statement from former narcotics officer, David Patchell, that "Ball turns [criminals] right back, and they commit crime after crime; they couldn't have a better friend," was printed although Salvato was told by a judge who had considerable experience with Patchell that he was "a very poor police officer, totally unreliable." Also, before Patchell's statement was printed, Ball's Assistant Commonwealth Attorney had gone to The Post and Salvato and tried to show them some applicable case files to establish Patchell's unreliability, files which they had refused to review.

There is other evidence from witnesses, too extensive to detail in the space of this Opinion, from which one could infer that Salvato held a grudge against Lou Ball.

One last item of particular note testified to by Ball was a statement that Salvato made to him during a telephone conversation, presumably implying a threat, that Ball would be "hearing from" them.

Turning from the underlying evidence which Ball cites as proof substantiating actual malice to the statements in the news articles which Ball specifically states to be false and defamatory, the major ones are these:

1) Patchell's statement, previously quoted, that Ball turns criminals "right back" into society to "commit crime after crime; they couldn't have a better friend."

2) "Ball has lost about half of the cases he has taken to trial in the last six years." Salvato admitted miscalculating his statistics on conviction rates when transposing the numbers into percentages, so that the percentages stated in the newspaper were false. The correct statistics would show Ball won 73% of the cases for the period involved.

3) A statement that Ball's office continually asks for unnecessary continuances, causing needless delay. A background check would have revealed the continuances were related to illness of the judge and other problems beyond the prosecutor's control.

4) Ball's office had a much greater propensity to dismiss persistent felony charges in exchange for a guilty plea as compared to Kenton County. The reporter knew the plea bargaining method was different so the statistics could not be compared.

5) Ball had brought a convicted felon to his office and coerced him by threat of a persistent felony charge to plead out. A check with this person's attorney would have proved this false.

6) Ball failed to give the Campbell County Attorney assistance in investigating misdemeanor charges involving pornography at the Cinema X when asked to do so. There was a letter from the County Attorney to Ball thanking him for his help.

The newspaper challenged the fact and degree of falsity of these statements (and others at issue), but there was substantial evidence from which the jury could decide that these statements were false, and they were certainly defamatory in the normal sense of the word. As defined in the *Restatement, Second, Torts:*

§ 559: "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

§ 563: "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express."

As is usual in cases such as this one, there was a great deal of conflict in the testimony as to what statements in the articles were statements of fact, as opposed to statements of opinion, and as to what the witnesses were actually saying when their various answers were compared one with the other. Isolated answers are often ambiguous, so the question then becomes what is the import of the answer when considered in context. At least in deciding what are the so-called underlying, subsidiary or historical facts, as contrasted with the finding of malice, where the evidence conflicts appellate review still must be in terms of what the jury could find as the true facts and what the jury could reasonably infer from the testimony of witnesses when considered as a whole. *Harte–Hanks Communications, Inc. v. Connaughton, supra.* We accept the jury's finding as to disputed facts when there is supporting evidence because we claim no superior ability to divine the truth by reason of judicial office, and we question the good judgment of any judge who thinks he has such special powers.

The landmark case extending First Amendment protection to comment by the news media on the conduct of public officials or public figures is, of course, *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *New York Times Co. v. Sullivan,* and its progeny, interpret the First Amendment guarantees of freedom of speech and press as

imposing constitutional limitations on state libel laws, holding that misstatements of fact published by the news media about the conduct of public officials enjoy constitutional privilege unless "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 376 U.S. 279–80, 84 S.Ct. at 725–26. As stated in *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition." In *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), reckless disregard is described as a "high degree of awareness of ... probable falsity," and in *St. Amant v. Thompson*, *supra*, 390 U.S. at 731, 88 S.Ct. at 1325, as circumstances proving the publisher must have "entertained serious doubts as to the truth of his publication." Rarely will the publisher confess to actual knowledge of falsity, or a high degree of awareness of probable falsity, or serious doubts as to the truth of the publication, and, nevertheless, as in the *Connaughton* case, *supra*, there are a number of cases subsequent to the *New York Times* case wherein the standard of reckless disregard has been proved by circumstantial evidence.

*New York Times* and its progeny further require that we "examine for ourselves the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect" (*Id.*, 376 U.S. at 285, 84 S.Ct. at 728), and that in "applying these standards ... the proof presented to show actual malice" must do so with "the convincing clarity which the constitutional standard demands" (*Id.*, 376 U.S. at 285–86, 84 S.Ct. at 728–29). We follow these precepts and find the evidence more than sufficient to rise to the standard imposed.

The most recent decision of the United States Supreme Court, the *Connaughton* case, plainly states that "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Supra*, 109 S.Ct. at 2686. It is not absolutely clear in the *Connaughton* case that the majority on the United States Supreme Court fully embraced the view taken in the Sixth Circuit Court of Appeals that a reviewing court should defer to all "subsidiary facts that the jury 'could have' found." 109 S.Ct. at 2680. Nevertheless the United States Supreme Court did identify three subsidiary fact issues which were in dispute wherein it stated "the jury *must* have rejected" the publisher's position, and the United States Supreme Court then concluded:

"When those findings are considered alongside the undisputed evidence, the conclusion that the newspaper acted with actual malice inextricably follows." 109 S.Ct. at 2681.

Justice Scalia, in his Concurring Opinion, states:

"This analysis adopts the most significant element of the Sixth Circuit's approach, since it accepts the jury's determination of at least the necessarily found controverted facts, rather than making an independent resolution of that conflicting testimony." 109 S.Ct. at 2701.

Justice Scalia's Concurring Opinion fully embraces the decision of the Sixth Circuit Court of Appeals that a reviewing court should accept the jury's determination as to all underlying, subsidiary or historical facts where on the evidence "the jury could reasonably have reached that conclusion," thus applying the customary "clearly erroneous" standard of appellate review before undertaking the independent review to determine malice which the First Amendment requires. These facts are reviewed on the basis of the reasonable inferences from the evidence presented by the prevailing party. It is interesting to note that three other members of the court, White, Kennedy, and the Chief Justice, "read ... the court's opinion" as "consistent with the views expressed by Justice Scalia in his concurrence." If the United States Supreme Court opinion is not co-extensive with the Sixth Circuit opinion in *Connaughton v. Harte–Hanks Communications, Inc.*, *supra*, it seems nearly so. Here, considering the plaintiff's evidence regarding factual

circumstances to prove malice and plaintiff's proof that statements in the article were false and defamatory, on independent review we find, with "convincing clarity" (*New York Times, supra.*), a "high degree of awareness of probable falsity" (*Garrison v. Louisiana, supra.*).

Recently, in *Fitch v. Burns*, Ky., 782 S.W.2d 618, 622 (1990), we had occasion to consider the meaning "of 'satisfying the burden of persuasion' where there is a 'requirement of clear and convincing proof.'" We state:

> "*McCormick [on Evidence,* 2nd ed., p. 796, Sec. 340(b) (1972)] states ... 'no high degree of precision can be obtained by these groups of adjectives.' ... the best formulation ... to express this concept is that the trier of fact 'must be persuaded that the truth of the contention is 'highly probable.''"

Here we have no hesitancy in stating that taking as true the plaintiff's proof as to the facts and circumstances surrounding publication of the November 17 and 19 articles in The Post on the "Portrait of a Prosecutor," the plaintiff has proved actual malice as defined in *New York Times v. Sullivan* and its progeny by clear and convincing evidence. We include in the circumstances surrounding publication the way in which the articles were laid out, the evidence regarding malice which we have discussed, and the failure to make any retraction.

■ The respondents have taken issue with the characterization as fact rather than opinion with regard to a number of the statements movant complains of as defamatory. Space does not permit discussing each statement separately. It suffices to say that in each instance we have considered the matter and determined that, taken in context and giving consideration to the various supporting facts and statistics elsewhere supplied in the article, we believe these statements can fairly be characterized as statements of fact rather than opinion. The statement most subject to debate is that from former narcotic officer, David Patchell, quoted in oversized print next to his picture at the top of p. 1 of the November 19, 1984 edition, that "Ball turns [criminals] right back, and they commit crime after crime; they couldn't have a better friend."

Recently we have had occasion to consider the issue of fact versus opinion in *Yancey v. Hamilton*, Ky., 786 S.W.2d 854, 856 (1990). In *Yancey*, the Kentucky Post "ran a feature story about Yancey's background as a 'sidebar' to the news article about his arrest [for double murder]." The article quoted a person who had "known the family for years" as stating, among other things:

> "He was a smooth talker. He was a con artist. I would never lend him money."

These remarks fall short of being as pointedly factual as those made by police officer David Patchell, credited with intimate knowledge of the way Louis Ball prosecuted his cases. In *Yancey*, we adopted the "approach to the fact-opinion distinction" found in *Restatement (Second) Torts,* § 566 (1977):

> "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory fact as a basis for the opinion." *Id.* at 857.

Patchell's statements certainly qualify as statements of fact under this standard, statements implying actual knowledge of undisclosed facts upon which he bases his opinion. The following quotation from *Yancey v. Hamilton, supra,* is equally applicable to the present case:

> "We have previously held that alleged defamatory statements 'should be construed as a whole.' *McCall v. Courier–Journal & Louisville Times*, Ky., 623 S.W.2d 882 (1981), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982); *see also Restatement* § 615 Comment d (factors considered by court and jury). Considering then, the statement here in contention, we find that in the whole context of its publication, Hamilton's comments created a reasonable inference that they were justified by undisclosed defamatory facts." *Id.* at 857.

The respondents complain that the instructions in the present case were deficient because they did not submit by separate interrogatory every alleged defamatory statement of fact and every alleged fact from which malice might be inferred, so that a reviewing court could utilize this information in conducting an independent review of the issue of actual malice. We have reviewed the court's instructions, and find them to be adequate. They conform to the Kentucky approach to jury instructions in civil cases, which is:

> "They should not contain an abundance of detail, but should provide only the bare bones of the question for jury determination. This skeleton may then be fleshed out by counsel on closing argument." *Rogers v. Kasdan*, Ky., 612 S.W.2d 133, 136 (1981).

The respondents did not specifically object to the instructions as given, as required by CR 51(3). Instead they tendered 41 "jury charges," 47 pages in length, followed by interrogatories which would have put the burden on the jury to "list those statements which you find to be false and not substantially true," then list "those false statements ... that you find to be of and concerning the plaintiff," then "repeat those false statements which are of and concerning the plaintiff ... which you also find to be defamatory of plaintiff," then "repeat each statement listed ... that you are clearly convinced was published by defendants with knowledge that the statement was false or with a high degree of awareness that it was probably false," etc., etc., etc. In short, the proposed interrogatories were both unsuitable and unreasonable, so completely so that they could not form the basis of a complaint regarding failure to give interrogatories, even were we otherwise so inclined to consider the matter.

We have reviewed the respondents' complaint regarding proof to support a damage award in the sum of $175,000. As stated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974):

> "[A]ctual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."

Given the enormous damage to the movant's reputation which could be reasonably inferred from the nature of the evidence produced, together with other evidence about the effect on him physically and emotionally, the award of $175,000 in compensatory damages was justified by the proof.

In conformity with the mandate of the United States Supreme Court, we have conducted an independent review of the record to insure that this verdict does not interfere with constitutionally protected free expression. For the reasons we have stated, we are convinced that it does not. We reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

STEPHENS, C.J., COMBS, GANT, LAMBERT and VANCE, JJ., and STEPHEN WILBORN, Special Justice, concur.