**Troy WELCH, Appellant,**

v.

**AMERICAN PUBLISHING COMPANY OF KENTUCKY, a/b/a The Daily News, Paul Douglas Hall, and Jimmy Pursiful, Jr., Appellees.**

No. 98–SC–0010–DG.

Supreme Court of Kentucky.

Oct. 21, 1999.

Michael Dean, London, Stella B. House, Manchester, for Appellant.

Jon L. Fleischaker, R. Kenyon Meyer, Cheryl R. Winn, Dinsmore & Shohl, LLP, Louisville, Cynthia Blevins Doll, Wyatt, Tarrant & Combs, Louisville, Bridget Leigh Dunaway, Taylor, Keller & Dunaway, London, W. Patrick Hauser, Barbourville, for Appellees.

LAMBERT, Justice.

An indispensable principle of free speech guaranteed by the First Amendment to the United States Constitution is "that de-

bate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 271, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964). Accordingly, political speech directed toward public officials is at the pinnacle of protected speech. Since rendition of *New York Times* in 1964, it has been clear that the constitutional protection of political speech requires public officials who bring defamation lawsuits against critics of their official conduct to meet a higher standard of proof than ordinary citizens if they are to prevail. In this case, we have been called upon to apply this rigorous standard in our review of an adverse judgment in a defamation lawsuit brought by a defeated mayoral candidate against the publishers of a political advertisement opposing the candidate's election.

In 1993, Troy "Frog" Welch, the two-term mayor of Middlesboro, Kentucky, sought re-election. Ben Hickman, a local businessman, was Welch's opponent. A few days before the Tuesday, November 2, 1993 election, a full-page paid political advertisement opposing Welch's re-election was published in *The Daily News,* a Middlesboro newspaper owned by American Publishing Company of Kentucky. Two supporters of Hickman, Jimmy Pursifal, Jr. and Paul Douglas Hall, paid for the ad, with much of the content being culled from back issues of *The Daily News.* A newspaper employee, Carla Bennett, helped Pursifal prepare the layout. The newspaper publisher, J.T. Hurst, glanced over the ad before it was published. The ad was published twice: on Saturday, October 30, 1993 and on Monday, November 1, 1993. The newspaper had an internal policy of not publishing political ads that raised new issues within the week before an election.

The ad consisted of three distinct sections. The top section contained a checklist of nine short reasons why Welch was not qualified to be mayor. This section

included the statements, "The City is Broke Because of His Management," "Employees Have Been Paid Almost $100,000 because of Political Firings," and "Frog Has Squandered Over 1½ Million Dollars of Surplus [City] Money." In the central and largest section were twenty-two headlines and excerpts from the accompanying articles, reprinted from previous issues of *The Daily News.* This section chronicled the low points of Welch's administration and was uniformly unflattering. In this section were printed the lines, "Mayor grabs councilman Gandy by the throat," and "KSP [Kentucky State Police] probing allegations of misconduct." Dividing the middle and the bottom sections of the ad was a strip of words: "Political Hirings–Political Firings–Harassment–Very Questionable Practices."

The bottom section of the ad contained a photo of Welch alongside photos of two other men. The caption above the three photos read, "The Welch Slate." This section also contained editorial text criticizing Welch's administration, including the following plea for votes: "Think before you vote and wonder why Frog and his cronies are working so hard to get rid of people who have stood in his way and called his hand on illegal activities. FROG WAS SUCCESSFUL IN RUNNING OFF 62 SEPARATE COUNCIL MEMBERS IN DISGUST" (emphasis in published text).

All of the aforementioned statements in the advertisement are alleged to be false and defamatory.

Welch lost the election and subsequently filed suit in the Bell Circuit Court against *The Daily News,* Pursifal, and Hall for defamation and false light invasion of privacy. Welch claimed that the ad ruined his reputation in Bell County and cost him the election. The trial court granted summary judgment in favor of all defendants, holding that Welch would be unable at trial to establish that the defendants had acted with "actual malice," the standard required for proving defamation of a public figure.

Prior to its final judgment, the trial court held a hearing, and the reasoning stated therein was incorporated into the decision. During this hearing, the trial court conducted a thorough review and analysis of many elements of defamation law as they touch upon this case. Among other considerations, the trial court viewed it as significant that the allegedly defamatory statements were made in a political ad, not in an investigative news story. The question of deciding First Amendment cases at the summary judgment stage was also addressed. The trial court considered it significant that many of the complained of statements were figurative and thus subject to varied interpretations. As an example, the trial court discussed the statement, "Mayor grabs councilman Gandy by the throat." In response to this allegedly false statement, Welch maintained that he merely grabbed the councilman by the tie, not the throat. The trial court pointed out that the person on the other end of the tie might have disagreed with Welch's interpretation of the event. In conclusion, the trial court recognized the value of freedom of the press during elections, stating perceptively that "our courts have concluded that our forefathers wanted the public to have the right to be bold and outspoken, even to the extent of poor taste."

In a unanimous decision, the Court of Appeals affirmed. In its decision, the court held that the newspaper's failure to investigate the veracity of the ad coupled with its failure to abide by the October 25 deadline could not support a conclusion that the newspaper acted with actual malice. The court also addressed Welch's claim that the trial court failed to consider his false light invasion of privacy claim. The court held that since proof of actual malice was also necessary to prevail upon the false light claim, that it likewise must fail.

■ Pursuant to CR 76.20, this Court granted discretionary review to consider Welch's contention that the trial court and the Court of Appeals committed reversible error. Welch supports this claim by first arguing that there were genuine issues of material fact as to whether the defendants acted with actual malice, and that summary judgment should not have been granted. *See* CR 56. The actual malice standard for defamation lawsuits brought by public officials against critics of their official conduct was announced in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In *New York Times,* the United States Supreme Court recognized that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive.' " 376 U.S. at 271–272, 84 S.Ct. at 721–722, 11 L.Ed.2d at 701–702 (quoting *N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963)). In light of these considerations, the court held that a defamatory statement about a public figure was actionable only if it was made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 280, 84 S.Ct. at 726, 11 L.Ed.2d at 706; *Warford v. Lexington Herald–Leader Co.,* Ky., 789 S.W.2d 758, 771 (1990); *Sparks v. Boone,* Ky.App., 560 S.W.2d 236, 238 (1977).

■ Actual malice entails more than mere negligence. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). It requires that the publisher of the defamatory falsehood have "entertained serious doubts" as to the truth of the published matter. *Warford* at 771 (quoting *Harte–Hanks,* 491 U.S. 657, 667, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562, 576 (1989)). This higher proof requirement for public figures is based upon the premise that unfettered political discussion is a necessary and fundamental principle of our constitutional system of government, assuring that political decisions will be made through persuasion rather than power. *New York Times,* 376 U.S. at 269–270, 84 S.Ct. at 72–721, 11

L.Ed.2d at 700–701. The standard of proof is similarly high, as actual malice must be shown by clear and convincing evidence. *Warford* at 771; *New York Times,* 376 U.S. at 285–286, 84 S.Ct. at 728–729, 11 L.Ed.2d at 709–710.

■ Citing *Ball v. E.W. Scripps Co.,* Ky., 801 S.W.2d 684, 688 (1990), Welch correctly maintains that actual malice can be inferred from circumstantial evidence, and he lists numerous factors in the record from which he claims actual malice can be inferred in this case: 1) the newspaper failed to investigate the facts before it published the ad; 2) although the newspaper publisher normally considers whether ads to be published may contain false statements, he was unconcerned about whether the ad in question contained false statements, 3) the publisher was sure that he looked at the ad before it was published; 4) the newspaper employee who helped prepare the ad did not investigate its accuracy, 5) the publisher allowed the statement, "disregarding policy, mayor upholds firings," to be printed even though the firing had been upheld in a federal civil suit that the publisher knew about, 6) the newspaper ran the ad in violation of its own policy of not accepting ads raising new political issues beyond an October 25 deadline, 7) the newspaper—which was the only newspaper in town and had covered city council meetings for years—must have known that the published statement, "Welch as mayor was successful in running off 62 council members in disgust" was false because there could not have been 62 members of a 12–member council in and out of office during Welch's 7–year term as mayor.

Welch contends that the Court of Appeals erred because it based its conclusion on a consideration of only two of the aforementioned factors, stating in its opinion, "We believe that the newspaper's mere failure to investigate the veracity of the political ads coupled with its failure to abide by the October 25 deadline cannot, alone, support a conclusion that the news-

paper published the ads with knowledge of their falsity or reckless disregard thereof." Slip. Op. p. 3–4. Although Welch has compiled a list of more factors than the two explicitly relied upon by the Court of Appeals, it is clear that this list is embraced by the two factors addressed by the Court of Appeals. Likewise, Welch's other complaints all turn upon an alleged failure to accurately investigate the facts asserted. Thus, we agree with the Court of Appeals' implicit characterization of the evidence of actual malice as twofold, entailing a failure to investigate and an alleged violation of an internal publishing deadline. We shall next consider whether these two factors create a genuine issue of material fact as to actual malice sufficient to survive the summary judgment motion.

■ It was established in *New York Times* that a newspaper's failure to investigate the accuracy of statements in a political ad prior to publication will not support a finding of actual malice. 376 U.S. at 287, 84 S.Ct. at 730, 11 L.Ed.2d at 710. The United States Supreme Court reached this conclusion despite the fact that material from the newspaper's own archives would have contradicted several statements in the ad at issue there. The United States Supreme Court speculated that the newspaper employees' failure to investigate the ad's accuracy might support a finding of negligence, but it was "constitutionally insufficient to show the recklessness that is required for a finding of actual malice." *Id.* at 288, 84 S.Ct. at 730, 11 L.Ed.2d at 711.

Welch argues, however, that *Warford v. Lexington Herald–Leader,* Ky., 789 S.W.2d 758, 772 (1990), supports the proposition that the failure to investigate an ad's veracity prior to publication alone is probative of actual malice. *Warford* involved an investigative news story that alleged that Warford, an assistant coach at the University of Pittsburgh, offered a high school basketball player money in an effort to induce him to attend the University of Pittsburgh. 789 S.W.2d at 760.

Although the high school recruit later retracted the allegation, the retraction was not mentioned when the story was reprinted. *Id.* Moreover, despite knowledge of other sources that might have verified or contradicted the recruit's initial allegations, the reporter failed to contact the other sources. *Id.* at 772. This Court held that the failure to investigate before publishing was not alone sufficient to establish reckless disregard, but could be probative of whether there was actual malice when viewed cumulatively with other evidence. *Id.* However, *Warford* is distinguishable from the case at bar as well as from *New York Times* because it involved an investigative news story rather than a political ad. This distinction is far from insignificant, because an investigative news story is the creation of newspaper employees, and it bears the newspaper's imprimatur. Thus, we view *New York Times* rather than *Warford* as decisive in deciding the instant case.

■ The newspaper's alleged failure to abide by its October 25 deadline likewise does not support a conclusion that the newspaper had actual knowledge of the ad's falsity or acted with reckless disregard thereof. The newspaper's policy was to publish no political ads that raised *new* issues after the prescribed date. The evidence of record, however, indicates that the newspaper did not violate this policy. The publisher, J.T. Hurst, stated in his deposition that there were no new issues in the ad. In another deposition, the newspaper employee who helped prepare the ad's layout, Carla Bennett, stated that "old headlines were not new issues."

It is further contended by Welch that the trial court erroneously held that the media have special protection from libel actions, effectively demanding a higher standard of proof to survive the summary judgment motion since a newspaper defendant was involved. He bases his argument on comments made at the hearing by the trial court:

[T]his is not just your normal summary judgment case . . . there are Constitutional hues and colors placed upon the Court, when it is dealing with this type of case, because of the potential impact that it could have upon the First Amendment Rights of the press.

This does not represent imposition of a higher standard of proof upon Welch. Moreover, it is a correct assessment of the importance of summary judgment in litigation involving First Amendment issues. Courts should take precautions to avoid the chilling effect on free speech that defamation lawsuits create. As stated in *Maressa v. New Jersey Monthly*, 89 N.J. 176, 445 A.2d 376, 387 (1982):

Courts should resolve free speech litigation more expeditiously whenever possible. The perpetuation of meritless actions, with their attendant costs, chills the exercise of press freedom. To avoid this, trial courts should not hesitate to use summary judgment procedures where appropriate to bring such actions to a speedy end.

*See also New York Times*, 376 U.S. at 279, 84 S.Ct. at 725, 11 L.Ed.2d at 706 ("A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship' ").

■ Welch contends that the Court of Appeals erroneously applied the summary judgment standard. Since rendition of our decision in *Steelvest v. Scansteel*, Ky., 807 S.W.2d 476 (1991), on the question of the proper standard for deciding summary judgment motions, much attention has been given to the use of the word "impossible." Summary judgment is improper unless it would be "impossible for the respondent to produce evidence at trial warranting a judgment in his favor and against the movant." *Id.* at 483. *Steelvest* did not repeal CR 56. *See* CR 56.03 (summary judgment shall be granted if "there is no genuine issue as to any material fact"). It merely stated forcefully that

trial judges are to refrain from weighing evidence at the summary judgment stage; that they are to review the record after discovery has been completed to determine whether the trier of fact could find a verdict for the non-moving party. *Steelvest* at 482–483. The inquiry should be whether, from the evidence of record, facts exist which would make it possible for the non-moving party to prevail. In the analysis, the focus should be on what is of record rather than what might be presented at trial.

The record in this case is devoid of any hint that the defendants entertained any doubts, much less serious doubts, about the truth of the statements published in the ad. In fact, the record suggests entirely the opposite conclusion. Apparently there were conflicts and disagreements between the mayor and city council during Welch's mayoral administration, and this was well-known and frequently reported in *The Daily News*. In such an environment, minor mistakes, exaggerations, or mixed assertions of fact and opinion which may have been in the ad could not form the basis for a finding of actual malice.

■ Since this case has been resolved on the basis of the plaintiff's inability to prove the required state of mind, it is unnecessary to determine which, if any, of the allegedly false statements were indeed false. It should be noted that although many of the allegedly defamatory statements that Welch complains of are disparaging, they are not so definite or precise as to be branded as false. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20, 110 S.Ct. 2695, 2705–2706, 111 L.Ed.2d 1, 18–19 (1990) (only provable false assertions of fact can provide the basis for a defamation action). Many of the phrases are figurative, and they employ rhetorical exaggeration to accomplish their intended purpose, which was to cast a political candidate in a negative light. For example, "The City is Broke Because of His Management" and "Frog Has Squandered 1 ½ Million Dollars of Surplus Money" both

contain language that defies precise definition. "Broke" has no specific meaning in accounting terms, although the fact that city bills were months overdue would tend to support use of such a term. "Squandered" connotes waste, but whether money was wasted or spent for desirable city purposes is a matter of opinion. This type of generalized rhetoric bandied about in a political campaign is not the language upon which a defamation lawsuit should be based, but instead is political opinion solidly protected by the First Amendment. *See e.g., Greenbelt Cooperative Pub. Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6, 15 (1970) ('blackmail' used to describe an extremely unreasonable position was held to be rhetorical hyperbole, not an accusation of committing the crime of blackmail); *Old Dominion Branch No. 496, National Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 285, 94 S.Ct. 2770, 2782, 41 L.Ed.2d 745, 762 (1974) ('scab' and 'traitor' were part of rhetorical hyperbole that must be tolerated in union organizing campaigns).

This opinion should not be interpreted as condoning political advertising which appears to have no purpose other than to sully the reputation of a candidate. Neither should this opinion be seen as a shield for those who remain deliberately ignorant when the circumstances call for inquiry into the veracity of the content of an ad. We simply say that the evidence of record here, when applied to the prevailing legal principles, was insufficient to create a issue for a jury to consider.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

JOHNSTONE, STUMBO, and WINTERSHEIMER, JJ., concur.

KELLER, J., files a separate opinion concurring in part and dissenting in part.

COOPER, J., dissents by separate opinion in which GRAVES, J., joins.

KELLER, Justice, concurring in part and dissenting in part.

I agree with the majority that the trial court was correct to enter summary judgment for American Publishing Company of Kentucky, d/b/a The Daily News. I write separately in this case because I believe there are material issues of fact with respect to whether Paul Douglas Hall ("Hall") and Jimmy Pursiful, Jr. ("Pursiful"), acted with actual malice when they financed and drafted, respectively, a political advertisement which contained allegedly false, libelous statements. After a review of the pretrial discovery record in this case, I conclude that summary judgment with respect to Troy Welch's claims against Hall and Pursiful was improper, and I would reverse the Court of Appeals with respect to those claims and remand the claims against Hall and Pursiful to the Bell Circuit Court for trial.

In order to demonstrate a prima facie case for defamation, Welch must produce evidence that (1) the language of the advertisement contains facially defamatory statements; (2) those facially defamatory statements are false; and (3) the persons responsible for those statements acted "with knowledge that [the statements were] false or with reckless disregard of whether [they were] false or not ." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Warford v. Lexington Herald–Leader Co.*, Ky., 789 S.W.2d 758, 771 (1990). To prevail on a motion for summary judgment, Hall and Pursiful must demonstrate that "it would be impossible for [Welch] to produce evidence at trial warranting a judgment in his favor." *Steelvest v. Scansteel.*, Ky., 807 S.W.2d 476 (1991); CR 56.03.

Justice Cooper's dissenting opinion correctly identifies that a written statement is facially defamatory and can be libelous, if false, when it tends to (1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or (3) injure him in his business or occupation. *McCall v. Courier Journal and Louisville Times Co.*, Ky., 623 S.W.2d 882, 884 (1981), *cert denied*, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982). For Welch to have a defamation cause of action, statements must not only tend to portray him in a negative light, but must also be false. Welch's deposition was taken in connection with discovery in this case, and he denied the truth of many of the allegations, thereby creating a factual dispute inconsistent with summary judgment. There are three statements which meet both of the first two elements of the prima facie case for defamation: (1) "Employees Have Been Paid Almost $100,000 because of Political Firings"; (2) "The City is Broke Because of his Management"; and (3) "Think before you vote and wonder why Frog and his cronies are working so hard to get rid of people who have stood in his way and called his hand on illegal activities. **FROG WAS SUCCESSFUL IN RUNNING OFF 62 SEPARATE COUNCIL MEMBERS IN DISGUST .**"

Most of the majority opinion focuses on Welch's evidence regarding actual malice, the third element of the prima facie case for defamation. With the exception of a handful of sentences which refer to "the appellees," both the majority opinion and the court of appeals analyze the salient issues exclusively from the perspective of The Daily News. While I agree with the majority opinion's conclusion that the trial court correctly granted summary judgment for The Daily News, the factual issues involving Hall and Pursiful are distinct, and summary judgment is not appropriate with respect to their claims. Actual malice can be inferred from circumstantial evidence. *Ball v. E.W. Scripps Co.*, Ky., 801 S.W.2d 684 (1990). The record in this case, including Pursiful's deposition in which his evasiveness is patent and during which he alleged an inability to remember circumstances surrounding the placement of this advertisement twenty-five times in an hour and three minute deposition, does not establish that it would be impos-

sible for Welch to prove the elements of his claim at trial.

It is not disputed that Pursiful went to The Daily News to purchase an advertisement on Hall's behalf. Carla Sue Bennett, an employee of The Daily News, testified at her deposition that Pursiful constructed the content of the advertisement himself, using notes he had brought with him, and that she assisted with formatting the layout. Pursiful admitted in his deposition that he voted for Welch's opponent and encouraged others to do so, although he quibbled over definitions when asked if he "supported" the opponent. Pursiful arranged for the advertisement to be placed on the eve of the election. The body of the advertisement has no headlines which support either the $100,000 allegedly connected with political firings nor the 62 council persons who it alleges left during Welch's tenure as mayor, and Welch alleges in his deposition that these figures are grossly out of proportion with reality. The newspaper and its employees deny authorship of the copy at the top and bottom of this advertisement. Summary judgment was proper for the claims against the newspaper because it had no duty under the circumstances to investigate the context of the paid advertisement. However, the persons responsible for the placement of this advertisement, Hall and Pursiful, had personal knowledge of the truth of their own words, or at the very least had an opportunity to determine whether the statements they made in the advertisement were true. The record of pretrial discovery does not establish that it would be impossible for Welch to prove that Hall and Pursiful acted either with knowledge that portions of the advertisement were false or with reckless disregard of whether the advertisement contained false information. At trial, Welch may not have prevailed on his claims, but summary judgment with respect to his claims against Hall and Pursiful was improper.

Accordingly, I would affirm the court of appeals with respect to the claim against American Publishing Company of Kentucky, d/b/a The Daily News, but would reverse with respect to the claims against Paul Douglas Hall and Jimmy Pursiful, Jr. I would remand those claims to the trial court for trial.

COOPER, Justice, dissenting.

The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.

. . . .

... The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.

*Rosenblatt v. Baer,* 383 U.S. 75, 92–3, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (concurring opinion of Justice Stewart).

There was a time in our history when damages to reputation were vindicated on the dueling ground. The 1804 duel at Weehawken, New Jersey, in which Alexander Hamilton was mortally wounded by Aaron Burr stemmed from Hamilton's slander of Burr's character. It is generally regarded that civil actions for libel and slander developed as a substitute for the duel and as a deterrent to murder. I. Brant, *The Bill of Rights: Its Origin and Meaning* 502 (Bobbs–Merrill Co.1965).

Though public officials and public figures are subjected to a higher standard of proof than private citizens, they are still afforded substantial protection against malicious defamation. All speech is not protected, even if directed against persons who have the temerity to seek and hold public office. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341, 94 S.Ct. 2997, 3007–08, 41 L.Ed.2d 789 (1974). In ap-

proaching any action for defamation against the press or the broadcast media, it is well to remember that while a public figure is held to a higher standard of proof than a private citizen when asserting an action for defamation, the publisher or broadcaster is not held to a lower standard than a private citizen in determining whether defamation has occurred. The reason virtually all defamation actions are brought against the print and broadcast media is the devastating impact which results from the wide dissemination of published falsehoods as opposed to the single lie uttered by one person to another. Nor should we view newspapers and the broadcast media as public service corporations. Most are not. They are privately owned corporations operated for profit whose owners are well aware of the influence which they wield in the political arena. Despite this position of power and influence, they are not held to a *higher* standard than the individual purveyor of false information. Nor should they be held to a *lower* standard.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a line was drawn between the respective burdens of proof of public officials and private citizens in actions for defamation. In *New York Times,* the advertisement in question was not so much a political advertisement as an appeal for financial and moral support for the civil rights movement in Alabama. In addition to extolling the righteousness of the movement and the leadership of Dr. Martin Luther King, Jr., the advertisement contained implicit criticism of the actions of local law enforcement officials in Alabama. The advertisement was endorsed and supposedly paid for by such well known figures as Dr. Martin Luther King, Sr., Rev. Ralph D. Abernathy, A. Phillip Randolph, Eleanor Roosevelt, Jackie Robinson, and a host of movie stars and other entertainers of the day. The portion of the advertisement which was claimed to be libelous was as follows:

In Montgomery, Alabama, after students sang "My Country, 'Tis of Thee" on the State Capitol steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission.

. . . .

Again and again the Southern violators have answered Dr. King's peaceful protests with intimidation and violence. They have bombed his home almost killing his wife and child. They have assaulted his person. They have arrested him seven times—for "speeding," "loitering" and similar "offenses." And now they have charged him with "perjury"— a *felony* under which they could imprison him for *ten years.*

*Id.* at 305, 84 S.Ct. at 740–41.

Most of these allegations were proven to be gross exaggerations, if not complete falsehoods. Sullivan was a city commissioner of Montgomery, Alabama, who supervised the police department and claimed to have been inferentially defamed by the reference to "police" and the suggestion that Dr. King was wrongfully "arrested." In reversing a $500,000 damage award in favor of Sullivan, the United States Supreme Court held (1) although truth is an absolute defense to an action for libel, mere falsity, *i.e.,* "erroneous statements honestly made," does not result in absolute liability, *id.* at 278–79, 84 S.Ct. at 725; (2) an action for defamation of a public official must be premised upon proof of "actual malice," *i.e.,* knowledge that the statement was false or with reckless disregard of whether it was false or not, *id.* at 279–80, 84 S.Ct. at 726; (3) mere failure to investigate even its own records was not conclusive evidence of "reckless disregard," where *New York Times* had relied upon the good reputations of the sponsors of the advertisement, *id.* at 287–88, 84

734

S.Ct. at 730; and (4) a government official cannot claim to have been inferentially libeled by the publication of an otherwise impersonal attack on governmental operations, *id.* at 288–92, 84 S.Ct. at 730–33.

The test for actual malice was refined in subsequent cases. In *Gertz v. Robert Welch, Inc., supra,* it was held that in order to recover for injury to reputation, a public official must prove actual malice by "clear and convincing proof." *Id.* at 342, 94 S.Ct. at 3008. Reiterating that mere failure to investigate does not satisfy the burden of proof, it was held in *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) that "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication;" and in *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), that the standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of ... probable falsity...." As we noted in *Ball v. E.W. Scripps Co.,* Ky., 801 S.W.2d 684, 689 (1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991), no publisher is going to confess to actual knowledge of falsity, or a high degree of awareness of probable falsity, or serious doubts as to the truth of the publication. However, such facts can be proven by circumstantial evidence. *Id.; Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 2686, 105 L.Ed.2d 562 (1989). Specifically, when reporting the allegations of a third party, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Harte–Hanks Communications, Inc. v. Connaughton, supra,* 491 U.S. at 688, 109 S.Ct. at 2696 (quoting *St. Amant v. Thompson, supra,* 390 U.S. at 732, 88 S.Ct. at 1326). Furthermore, "[a]lthough failure to investigate will not alone support a finding of actual malice, ... the purposeful

avoidance of the truth is in a different category." *Id.* at 692, 109 S.Ct. at 2698.

Relying on the United States Supreme Court's then recent decision in *Harte–Hanks Communications, Inc. v. Connaughton, supra,* we held in *Warford v. Lexington Herald–Leader Co.,* Ky., 789 S.W.2d 758 (1990), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 754, 112 L.Ed.2d 774 (1991) that while failure to investigate before publishing is not itself sufficient to establish "reckless disregard," it is probative of malice when coupled with other evidence, *id.* at 772; that actual knowledge of potential harm heightens the responsibility to investigate and the failure to do so may be considered evidence of malice, *id.;* and that the construction of statements or incidents in favor of the most potentially damaging alternative "creates a jury question on whether the publication was indeed made without serious doubt as to its truthfulness." *Id.* at 773 (quoting *Rebozo v. Washington Post Co.,* 637 F.2d 375, 382 (5th Cir.1981), *cert. denied,* 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981)).

Here are some of the things the advertisement published by *The Daily News* had to say about Appellant, who was then the mayor of Middlesboro:

√ The City is Broke Because of His Management.

√ The City Has Not Paid Its Bills For August, September & October.

√ Legal Fees Have Exceeded $200,000 in the last 3 years.

√ Employees Have Been Paid Almost $100,000 because of Political Firings.

√ Frog Has Squandered Over 1–1/2 Million Dollars in Surplus Money.

√ Council Members Have Been Physically Attacked.

The advertisement also reprinted excerpts from news articles in past editions of *The Daily News.* Some examples:

Mayor's action illegal.

Mayor grabs councilman Gandy by the throat.

KSP probing allegations of misconduct.

The advertisement concluded with a plea to readers to elect Appellant's opponent in the upcoming mayoral election. That plea included the following:

> Don't be fooled by the smoke screen and lies. Think before you vote and wonder why Frog and his cronies are working so hard to get rid of people who have stood in his way and called his hand on illegal activities. **FROG WAS SUCCESSFUL IN RUNNING OFF 62 SEPARATE COUNCIL MEMBERS IN DISGUST.** (Emphasis in original.)

Although the advertisement states that it was paid for by Paul Douglas Hall, it was Jimmy Pursiful, Jr., who actually came to *The Daily News* and requested assistance in preparing the advertisement. The employee who assisted him was Carla Sue Bennett. Although she had seen Pursiful in the community, Bennett did not know him. Neither she nor the newspaper's publisher, J.T. Hurst, purported to rely on the reputations of Pursiful and Hall with respect to the accuracy of the allegations in the advertisement. *Compare New York Times Co. v. Sullivan, supra.* Bennett testified that Pursiful prepared most of the material before he arrived at her office and that she merely directed him to bound volumes of old editions of *The Daily News* from which he selected the headlines and excerpts which were included in the advertisement. Pursiful testified that he was but a courier from Hall and that Bennett researched and prepared the material contained in the advertisement. It should be noted in passing that it is immaterial that some of the matter contained in the advertisement was a republication of allegations contained in previous editions of *The Daily News.* If the allegations were libelous when originally published, they were equally libelous when republished. *Warford v. Lexington Herald-Leader Co., supra,* at 772.

A writing is defamatory if it tends to (1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or (3) injure him in his business or occupation. *McCall v. Courier-Journal and Louisville Times Co.,* Ky., 623 S.W.2d 882, 884 (1981), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982). Allegedly defamatory words "must be measured by their natural and probable effect on the mind of the average lay reader and not be subjected to the critical analysis of the legal mind." *Id.* When criminal activity is alleged, the publication is libelous *per se. Columbia Sussex Corp., Inc. v. Hay,* Ky.App., 627 S.W.2d 270 (1981); 50 Am.Jur.2d *Libel and Slander* § 165 (1995). The same is true with respect to allegations which impugn one's competence, capacity, or fitness in the performance of his profession, trade, or business. 50 Am.Jur.2d *Libel and Slander* § 212 (1995). One who attains public office does not thereby become the deer in the headlights of the tabloid press. "Even privilege has its limitations and even a public figure in the midst of a political campaign is entitled to some degree of protection." *Silsdorf v. Levine,* 59 N.Y.2d 8, 462 N.Y.S.2d 822, 449 N.E.2d 716, 721 (1983), *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983). In *Silsdorf,* false statements that a mayor's administration was corrupt, that it paid to do business with the mayor, and that the mayor was profiting in his law practice at the village's expense, were held actionable because such statements were capable of being interpreted by the average reader as charging the mayor with illegal conduct while in office. *Id.*

If false, the statements in the advertisement in question in this case were clearly libelous. To the majority opinion's assertion that allegations that the "city is broke" and that Appellant has "squandered over 1-1/2 million dollars" are not libelous because those statements defy precise definition, I would respond that anyone who does not know the meaning of "broke" has never been there. *Webster's Third New International Dictionary (Unabridged)* (Merriam-Webster, Inc.1993)

defines "broke" as "without money or resources, penniless, bankrupt," *i.e.*, precisely how the average lay reader would define it. The same source defines "squander" as "to spend extravagantly or foolishly, especially to the point of depletion" or "to spend in a wasteful manner," also precisely how the average lay reader would define it. Regardless, we laid this issue to rest in *Yancey v. Hamilton*, Ky., 786 S.W.2d 854 (1990), in which we held that if "the words at issue are capable of more than one meaning ... the jury should decide which of the meanings a recipient of the message would attribute to it." *Id.* at 858.

Having determined that the advertisement was facially defamatory, the remaining issues are whether the statements in the advertisement were false and whether there was sufficient evidence of actual malice to avoid summary judgment. Appellant testified by deposition that most of the accusations made in the advertisement were false. There is little, if any, evidence in this record to the contrary; and, for purposes of summary judgment, the trial court was required to accept Appellant's testimony in that regard. CR 56.03; *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476, 480 (1991). I reject the majority opinion's suggestion that a higher summary judgment standard exists in defamation cases because of First Amendment implications. The higher standard relates to the plaintiff's ultimate burden of proof at trial. A motion for summary judgment is not equivalent to a motion for directed verdict. On motion for summary judgment, the burden is on the movant to prove the nonexistence of an issue of material fact. The respondent is not required to try his case in response to the motion. *Steelvest, supra*, at 482–83.

There is ample circumstantial evidence from which a reasonable jury could find clear and convincing proof of actual malice in this case. Unlike *New York Times Co. v. Sullivan, supra*, the newspaper here did not rely on the good reputation of the sponsors of the advertisement. The employee who prepared the advertisement did not even know the person whom she claimed furnished the defamatory information. However, she must at least have assumed that Hall and Pursiful were supporting Appellant's political opponent in the upcoming election, and, thus, that they might well have been motivated to falsely accuse him of wrongdoing. Remember, when reporting the allegations of a third party, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Harte–Hanks Communications, Inc. v. Connaughton, supra*, 491 U.S. at 688, 109 S .Ct. at 2696 (quoting *St. Amant v. Thompson, supra*, 390 U.S. at 732, 88 S.Ct. at 1326). Appellant points out that the newspaper must have known that he could not have been "successful in running off 62 separate council members in disgust," because there had not been sixty-two members of the city council during his seven year tenure as mayor. Remember, "[a]lthough failure to investigate will not alone support a finding of actual malice, ... the purposeful avoidance of the truth is in a different category." *Id.*, 491 U.S. at 692, 109 S.Ct. at 2698.

J.T. Hurst, publisher of *The Daily News*, testified that truthfulness was a concern when deciding whether to publish any political advertisement, but that he was unconcerned about the truthfulness of the accusations in this particular advertisement. Certainly, the nature of the accusations were sufficient to put him on notice of their potential harm to Appellant; thus, the failure to investigate was at least evidence of malice. *Warford v. Lexington Herald–Leader Co., supra*, at 772. Hurst also testified that it was the newspaper's policy never to prepare copy for political advertisements. Yet, Pursiful testified that Bennett not only prepared the copy, but researched the newspaper's back issues and selected the unfavorable headlines and excerpts used in the advertisement. In view of that evidence, Bennett's failure to further investigate the same

source to determine whether the accusations which she placed in the advertisement were true "creates a jury question on whether the publication was indeed made without serious doubt as to its truthfulness." *Id.* at 773 (quoting *Rebozo v. Washington Post Co.,* 637 F.2d 375, 382 (5th Cir.1981), *cert. denied,* 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981)). Hurst further testified that it was the newspaper's policy not to accept political advertisements raising new issues after a specified cut-off date, so that the opposing candidate would have an opportunity to respond to the new allegations. In this case, the cut-off date was October 25, 1993. This advertisement was published on October 30, 1993 and again on November 1, 1993, the day before the election. Hurst's explanation of this apparent deviation from policy was that "[t]here were no new issues in the ad." While that may have been true with respect to the excerpts from previous editions of the newspaper, it was not true with respect to allegations that "the city is broke," that "legal fees have exceeded $200,000 in the last three years," that "employees have been paid almost $100,000 because of political firings," that Appellant "has squandered over 1–1/2 million dollars" of the city's money, and that Appellant "was successful in running off 62 separate council members in disgust."

In summary, there was evidence that the publication of this advertisement was in violation of two of the newspaper's own policies, that the publisher was unconcerned whether the obviously scandalous accusations contained in the advertisement were true, and that the advertisement was either researched and prepared by the newspaper's own staff or was published at the request of persons whose motives for veracity the newspaper had ample reason to doubt. This was sufficient circumstantial evidence of actual malice to submit this case to a properly instructed jury.

The majority opinion, as did the trial judge, mistakenly concludes that the news-paper should be held to a lower standard in this case because the alleged defamation was published in a political advertisement rather than a news story. In *New York Times Co. v. Sullivan, supra,* the plaintiff, Sullivan, argued that a *higher* standard should be imposed in the case of a political advertisement, because publication was prompted by a motive for profit rather than a motive to communicate information. That argument was rejected. "[I]f the allegedly libelous statements would otherwise be constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement." *Id.,* 376 U.S. at 266, 84 S.Ct. at 719. It is preposterous to suggest that a *lower* standard should be applied when a newspaper publishes allegedly libelous material for profit. This is but an alternative version of the defense of "neutral reportage" which we soundly rejected in *McCall v. Courier–Journal and Louisville Times Co., supra,* at 886–87.

Much is made of the fact that Appellant was unable to identify any special damages other than his failure to win reelection as mayor of Middlesboro. However, in this type of case, "actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 350, 94 S.Ct. at 3012. If the defamatory material is libelous *per se,* neither allegation nor proof of special damages is required. They are conclusively presumed. *Tucker v. Kilgore,* Ky., 388 S.W.2d 112, 116 (1965).

Long ago, we abandoned the dueling ground in favor of the courtroom for redress for the malicious destruction of one's good name. As we enter the third decade of the "attack ad" era of Kentucky politics, we should not forget why the common law action for defamation was created in the first place. Unfortunately, the majority

opinion in this case substantially diminishes the legal remedy available to victims of defamation by establishing a burden of proof that is impossible to meet. Today, we essentially hold that the reputation of a public official is fair game for those who stand to benefit from its destruction, and that one who seeks or accepts public office thereby forfeits the right to legal redress for injuries inflicted by malicious liars. I do not believe that to be the state of the law or what the law should be. For that reason, I would reverse the Court of Appeals and remand this case to the Bell Circuit Court for a trial on the merits.

GRAVES, J., joins this dissenting opinion.