RENDERED: JANUARY 20, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0010-DG

PAUL KEARNEY, M.D.                                                              APPELLANT

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2018-CA-1270
FAYETTE CIRCUIT COURT NO. 15-CI-00551

UNIVERSITY OF KENTUCKY                                                          APPELLEE

**OPINION OF THE COURT BY JUSTICE HUGHES**

**<u>AFFIRMING</u>**

The Kentucky Whistleblower Act (KWA) protects the governmental employee who brings to light his employer's wrongdoing as defined by Kentucky Revised Statute (KRS) 61.102(1). Wrongdoing includes violation of "any law, statute, executive order, administrative regulation, mandate, rule, or ordinance." Upon this review of a summary judgment in favor of the University of Kentucky (UK or University), we must determine whether the KWA protects a UK employee who reports the violation of an internal administrative regulation, here AR 3:14. We conclude that KRS 61.102(1) refers to an administrative regulation duly promulgated pursuant to KRS Chapter 13A and thus the employee's allegations related to AR 3:14 do not constitute a disclosure protected by the KWA. We also conclude that the employee's other identified

communications do not meet the KWA's requirements. The communication related to UK's alleged mismanagement of the Kentucky Medical Services Foundation (KMSF)'s funding lacks objective facts or information, a prerequisite for a disclosure protected by the KWA. Furthermore, the affidavit related to KMSF's use of funds, which was filed in the record of this case after the employee's disciplinary action concluded and after UK notified the employee that his salary was being reviewed due to the material change in his employment status, is not evidence sufficient to allow a reasonable person to conclude the affidavit's disclosures were a contributing factor in the employee's May 2016 salary reduction. On discretionary review, we agree with the trial court and the Court of Appeals that summary judgment is proper in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

Dr. Paul Kearney, a trauma surgeon and tenured professor of surgery, initiated this action against UK in February 2015, alleging claims under the KWA, KRS 61.101-61.103. Dr. Kearney claims that UK retaliated against him, including suspending his clinical privileges to practice medicine at the University's hospital and clinics, because he disclosed administrative wrongdoing. UK counters that the acts which Dr. Kearney complains about are disciplinary-related acts only and are the result of Dr. Kearney's improper, unprofessional behavior over many years when interacting with staff and students, and more recently, a patient. UK moved the trial court for summary judgment arguing that Dr. Kearney could not establish a prima facie case of whistleblower retaliation. The trial court granted summary judgment, agreeing

2

that Dr. Kearney fails to qualify for whistleblower protection under KRS 61.102. The Court of Appeals affirmed the trial court. This Court granted discretionary review to determine if any of Dr. Kearney's statements at issue are protected disclosures under the KWA.

Dr. Kearney identifies four statements which he alleges disclosed wrongdoing, all statements related to the College of Medicine's Practice Plan Committee (PPC) and to the KMSF. Dr. Kearney believes his statements brought to light the University administration's non-compliance with an administrative regulation, mismanagement, waste, fraud or abuse of authority. This being a review of a summary judgment, the record must be viewed in a light most favorable to Dr. Kearney and all doubts are to be resolved in his favor. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991).

The PPC was created in July 2009 by the UK Board of Trustees through UK's AR 3:14.[1] AR 3:14, Article X, states in part, "The Committee shall meet periodically and shall review the operation of the Plan and the College Addendum, including matters relating to the applicability of the Plan to sources of income, standard schedules of charges for services, and any other aspects of the operation of the Plan." As described by Dr. Kearney, AR 3:14 formed the College of Medicine budgetary oversight committee and mandated that the committee meet periodically to fulfill that budgetary watchdog role.

---

[1] UK states that the role of the PPC is to review the operation of the medical practice plan and make recommendations to the Dean of the College of Medicine.

3

The KMSF is a non-profit, non-member 501(c)(3) corporation. The KMSF serves as a medical services organization collecting the billings generated by the UK hospital clinical physicians and returning those funds back to the physicians in the form of salaries and for research. KSMF's board of directors is comprised of the College of Medicine's department chairs and six elected faculty.

KMSF and UK have entered into an annually renewable contract. The contract reads in part: "The parties agree that the University Internal Auditors may conduct an audit of Foundation's operations and accounts for period ending June 30, 2014 and such other audits, including audits to determine compliance with this agreement . . . ." The contract also carves out the Academic Enrichment Fund for the College of Medicine. The contract provision pertaining to the Academic Enrichment Fund directs that "eight percent (8%) of the actual clinical income collected by said Foundation [is] to be used by the Dean of the College of Medicine for the enrichment of the programs of the College or for related purposes at his/her sole discretion." Considering that the College of Medicine's department chairs are appointed by and serve at the pleasure of the Dean of the College of Medicine, and that those department chairs also serve on the KMSF board of directors, Dr. Kearney states that absent a functioning PPC to act in the budgetary oversight role, the opportunity for abuses of discretion regarding millions of dollars is real.[2]

_____

[2] Darrell Griffith, who served as the Executive Director of the KMSF from March 2006 to May 2014, states in his December 2015 affidavit that the KMSF was responsible for collecting net revenue in excess of $200 million. Although no

4

The Faculty Council of the College of Medicine, 2013-14, was composed of UK clinical physicians holding staff privileges at the University's hospital and non-medically licensed professors in the medical college. Dr. Kearney and Professor Davy Jones, members of the Faculty Council, addressed that body at a January 21, 2014 meeting about the PPC. Professor Jones relayed that through open records requests he learned that the PPC had not met since its creation in July 2009. The Faculty Council meeting minutes reflect Dr. Kearney elaborated on Professor Jones's presentation. Dr. Kearney, as a voting practice plan member, made inquiries and obtained information confirming there had never been a direct election for members of the PPC.[3] After the Faculty Council's lengthy discussion of the PPC, the Faculty Council decided, as a first step, to send recommendations to the Dean of the College, then Dr. Frederick de Beer. In response, Dean de Beer sent a memo to the Faculty Council informing it that then-Executive Vice President for Health Affairs (EVPHA) Dr. Michael Karpf and General Counsel William Thro would like to address the Faculty Council regarding a legal matter at its April meeting.

The Faculty Council met April 15, 2014. Dean de Beer, EVPHA Dr. Karpf, General Counsel William Thro, and the faculty-elected trustee to the University Board of Trustees, Dr. John Wilson, attended the meeting. According to Dr. Kearney, he made two disclosures of wrongdoing at the April

---

timeframe is stated, Dr. Kearney's summary judgment response indicates that Griffith is referring to KMSF collecting annual revenues of $200 million.

[3] The minutes reflect that a group of six faculty members was convened in October 2013 and informed they constituted the PPC.

5

meeting. First, he reported the violation of AR 3:14, which governs the practice plan and practice contracts that are signed with the physicians. Second, being also concerned about mismanagement of KMSF funds, he spoke directly to General Counsel Thro, stating, "I think we need to have an outside attorney, somebody not affiliated with the university, look at the practice plan contracts and how they were developed." He then said, "I think we need an independent audit of KMSF to look at the management of monies there." Dr. Kearney describes this statement being promptly followed by Dr. Karpf raising his voice, pointing his finger at him, and saying, "Dr. Kearney, if you don't like it here, you can leave." Dr. Kearney viewed this as a threat to fire him.

In the fall of 2014, Dr. Kearney was the subject of two new complaints and the disciplinary action at issue in this case followed. In August 2014, Dean de Beer suspended Dr. Kearney's teaching duties following a student's complaint about a lecture filled with profanity and racist, sexist and other offensive remarks. In September 2014, Dr. Bernard Boulanger, Chief Medical Officer, suspended Dr. Kearney from clinical practice at the University's hospital because of a patient's complaint.[4] Dr. Kearney was placed on administrative leave while the University investigated. Dr. Boulanger also imposed an order prohibiting Dr. Kearney from communicating with UK medical colleagues and banning Dr. Kearney from campus.

---

[4] A quadriplegic patient's mother stated that Dr. Kearney called her son "a f**king quad," a "f**king idiot," and told a physician Dr. Kearney was supervising "just f**king cut him."

6

Dr. Kearney identifies his next disclosure as an email to UK Associate General Counsel Cliff Iler on November 3, 2014, sent after Dr. Kearney was placed on administrative leave. In that November communication, Dr. Kearney, through his attorney, rejected UK's offer to negotiate a severance package. The email alleged that the most recent complaints against Dr. Kearney were a contrived effort for the sole purpose of removing him from his position in retaliation for "his public disclosure of Dr. Karpf's impropriety i.e., attempting [to] gain control of KMSF practice plan funding contrary to University regulations."

After completion of the investigation and a resolution with Dr. Kearney was not reached, Dr. Boulanger summarily suspended Dr. Kearney in January 2015, finding violations of both UK Healthcare Medical Staff Bylaws and the Behavioral Standards in Patient Care Commitments to Performance. The matter proceeded to the Medical Staff Executive Committee (MSEC), the self-governing body of UK Healthcare's medical staff, consisting of twelve physicians. On January 29, 2015, the MSEC resolved to conduct an independent investigation into the allegations against Dr. Kearney. Two of the MSEC's members were appointed to conduct the investigation, and on February 5, 2015, they presented their findings to the full MSEC. The MSEC's investigators reviewed complaints from staff, students, and Dr. Kearney's peers concerning Dr. Kearney's behavior dating back to 1992. They also interviewed a number of individuals, including Dr. Kearney, concerning the patient

7

incident.  In February 2015, the MSEC voted to affirm Dr. Kearney's suspension and recommended a revocation of clinical privileges.[5]

Dr. Kearney requested a hearing before a Fair Hearing Panel, a panel composed of three of his medical staff colleagues.  In a two-day hearing in late May, the panel heard testimony and received exhibits.  Dr. Kearney cross-examined UK's witnesses, called his own witnesses, and testified on his own behalf.  The panel issued a written decision unanimously concluding Dr. Kearney violated both the UK Healthcare Medical Staff Bylaws and the Behavioral Standards in Patient Care Commitments to Performance and recommending revocation of his medical staff privileges.[6]

Dr. Kearney appealed this decision to UK's Board of Trustees' Health Care Committee where three trustees were appointed to hear his appeal. Following briefing and oral arguments, the trustee panel also unanimously recommended permanent revocation of privileges.  On August 24, 2015, the full Health Care Committee unanimously affirmed the revocation of Dr. Kearney's clinical privileges but modified the Appellate Review Panel's recommendation, reaffirming Dr. Kearney's status as a tenured faculty member.  The Committee stated that

> the University will (1) allow Dr. Kearney to have access to campus;
> (2) allow Dr. Kearney to have an office in an appropriate location;
> (3) allow Dr. Kearney to communicate with his university

---

[5] Dr. Kearney alleges that he was not notified and afforded the opportunity to be at the MSEC hearing held the afternoon after he was interviewed.  Dr. Kearney does not raise due process claims.

[6] The Report is undated but from internal references appears to have issued in late June or early July 2015.

8

colleagues; and (4) lift the suspension of Dr. Kearney's university e-mail account. Dr. Kearney's access to campus will be no greater or less than those of a tenured faculty member who lacks clinical privileges. This reaffirmation should happen immediately.

At this point, Dr. Kearney remained a tenured faculty member. On August 28, 2015, UK communicated through counsel that because Dr. Kearney's status had materially changed as a result of the Committee's action, at the direction of the University President a group of appropriate persons was immediately formed to comprehensively define Dr. Kearney's roles and responsibilities going forward. UK acknowledged that to avoid confusion, Dr. Kearney should have been informed that such a review was underway and that it would communicate the results as soon as possible. UK stated that because the Committee had reaffirmed his status as a tenured professor within the College of Medicine, it was faced with the challenge of finding an appropriate role for Dr. Kearney, given his unique status as a tenured faculty member in the Department of Surgery who lacked clinical privileges.

Beginning with the August 2015 letter, UK communicated to Dr. Kearney the limitations on his role at the University. According to UK, given the requirement of the University's accrediting body, without clinical privileges Dr. Kearney could not teach in the College of Medicine.[7] UK stated that because Dr. Kearney's status had materially changed, UK would continue to review

---

[7] UK's March 2016 letter to Dr. Kearney also stated that in preparing his detailed plan for making future contributions to the University in general and for becoming a productive researcher in particular, Dr. Kearney must recognize "because of accreditation concerns and his previous behavior in a classroom setting[], he may not interact with medical students or graduate medical students."

every aspect of his employment, including his compensation. According to UK, when its efforts to move Dr. Kearney into a productive research role, beginning with his submission of a detailed plan, a so-called "Distribution of Effort," were not successful, Dr. Kearney's salary was reduced. Dr. Kearney received his reduced salary until he retired from the University in October 2019. Dr. Kearney views his salary reduction as a continuation of the reprisals he experienced, stating that others teach in the UK College of Medicine without a medical degree or license to practice medicine.

Dr. Kearney filed his action against UK in Fayette Circuit Court on February 12, 2015, while the proceedings regarding revocation of his clinical privileges were well underway. Based upon a September 2014 order not to communicate with UK,[8] Dr. Kearney views his complaint and the Griffith affidavit that was filed in the court record a year later, in February 2016, as other disclosures of regulation violation, mismanagement, waste, and abuses of authority by UK administration. In his affidavit, Darrell Griffith, the Executive Director of KMSF from March 2006 to May 2014, identified certain KMSF business dealings which Dr. Kearney views as mismanagement of funds. These business dealings, for example, included the leasing of an airplane with a separate agreement for the pilot. Griffith stated that KMSF exceeded its

---

[8] Dr. Boulanger's September 5, 2014 communication to Dr. Kearney regarding the administrative leave stated, "All communications you have with the University will be with me through my office."

scope and described an alleged breach of the KMSF Board of Directors' fiduciary duty to inform the UK Clinical Faculty of KMSF's business activities.

After an unsuccessful motion to dismiss and the discovery period that followed, in February 2018 the University moved for summary judgment. UK argued that Dr. Kearney could not establish his comments at the April 15, 2014 Faculty Council meeting were a disclosure because all information contained in Dr. Kearney's complaints concerning AR 3:14 and the PPC was either publicly known or publicly available information and the comments did not reveal any violation of law or rule. UK argued particularly that the comments concerning an alleged violation of an internal University regulation are not protected under the KWA "because University regulations are not a regulation of 'the United States, the Commonwealth of Kentucky, or any of its political subdivisions' (i.e., counties)." UK posited that the complaint about the PPC is nothing more than a complaint of allegedly deficient communication among University employees, that is between PPC Board members and the Faculty Council and/or other physicians who are plan members.

UK also argued that Dr. Kearney's non-specific request for a KMSF audit was too vague to constitute a report of either a violation of law or of mismanagement, fraud or waste. In relation to the allegations of KMSF fund mismanagement and KMSF's breach of its fiduciary duty contained in Griffith's affidavit, UK asserted that the affidavit, filed in the record by Dr. Kearney in February 2016 when responding to UK's renewed motion to dismiss, is not a disclosure related to the alleged retaliation because the University's

11

disciplinary proceedings against Dr. Kearney concluded six months before the affidavit was filed.[9]  During the hearing on the motion, Dr. Kearney disagreed with the timing argument, asserting that the reprisals against him did not stop when the full Health Care Committee unanimously affirmed the revocation of his clinical privileges.  He contended that the reprisals were ongoing, noting among other actions, UK did not allow him to teach.

As to the November 3, 2014 email to the General Counsel's office and Dr. Kearney's pleadings in this case being additional KWA reports, UK maintained that none of these "reports" revealed concealed or publicly unknown information.  UK further contended that Dr. Kearney's email, complaint, and pleadings center on the same statements he made at the April 15, 2014 Faculty Council meeting concerning AR 3:14, the PPC, and a general request for an audit of KMSF.

In regard to Dr. Kearney's allegation that he blew the whistle to then-Dean of the College of Medicine, Dr. de Beer, then-EVPHA Dr. Karpf, UK General Counsel Thro, and Trustee Dr. Wilson in April 2014, UK argued that Dr. Kearney's complaints were also not made to an appropriate body or official.[10]  As for the April 2014 KMSF statements, UK maintained that since

---

[9] UK made this argument in its summary judgment motion reply.  In addition to the April 2014 statements discussed in UK's motion, Dr. Kearney's response identified disclosures made via the November 2014 email to UK's General Counsel's office, his pleadings, and Griffith's affidavit.

[10] Given General Counsel Thro's presence at the meeting, UK contended that *Pennyrile Allied Community Services, Inc. v. Rogers*, 459 S.W.3d 339, 345 (Ky. 2015), holding that a complaint during a staff meeting to the boss about the boss's own action was not a report to an appropriate authority, imposed a significant limitation on *Workforce Development Cabinet v. Gaines*, 276 S.W.3d 789 (Ky. 2008).  *Gaines* held

KMSF is an organization independent from the University, UK General Counsel

Thro is not an appropriate person for reporting complaints concerning KMSF.[11]

---

that a report to the general counsel's office in the Workforce Development Cabinet may constitute an internal disclosure.

[11] Dr. Kearney's complaint states:

> The defendant university, by and through its authorized agents including Dr. Michael Karpf has caused and continues to cause, improper access to Kentucky Medical Service Foundation's financial resources. The Kentucky Medical Services Foundation is a non-profit entity separate and apart from the university. The manner and method employed by the defendant university to access the funds of the Kentucky Medical Services Foundation were kept from public disclosure.

In his summary judgment response, explaining the allegations of UK's mismanagement of money generated by the UK Clinical physicians and the structure through which that occurred, citing KMSF President Dr. Marcus Randall's July 2016 deposition, Dr. Kearney stated: "As a non-profit, non-member 501[(c)(3)] corporation KMSF maintains that it is not affiliated with the University of Kentucky [and is] thus beyond the purview of the UK Board of Trustees." Relatedly, Griffith's affidavit states, "During my tenure . . . [KMSF] operated as a private non-stock, nonprofit corporation organized under the laws of the Commonwealth of Kentucky. As a non-stock, nonprofit, private corporation[,] [KMSF] was not subject to Open Records Requests." Dr. Randall was questioned during his deposition about the Attorney General's KMSF "public agency" decision in an Open Records case and noted that the Attorney General's decision was being appealed.

When the trial court concluded that the KMSF was a private entity and therefore UK administration was not the proper authority to remedy complaints against KMSF, Dr. Kearney argued to the Court of Appeals that the trial court failed to address the contractual relationship of KMSF, the UK Board of Trustees, and the Dean's Enrichment Fund and that by the terms of their contract, UK and KMSF are inextricably intertwined. Dr. Kearney further argued that the contract between KMSF and UK empowers the Board of Trustees to audit the books and accounts of KMSF thereby squarely placing Trustee Dr. John Wilson as the "appropriate" person under *Gaines* to address the disclosure regarding KMSF as well as the report of the AR 3:14 infraction.

At the point UK moved for summary judgment (February 8, 2018), the Kentucky Attorney General had issued a decision, *In re: Lachim Hatemi/Kentucky Medical Services Foundation, Inc.*, 15-ORD-205 (Nov. 6, 2015), concluding that KMSF is a public agency for open records purposes pursuant to KRS 61.870(1)(j) (defining "public agency" as including any board, commission, committee, subcommittee, ad hoc committee, advisory committee, council, or agency, except for a committee of a hospital medical staff, established, created, and controlled by a public agency as defined by the other paragraphs within KRS 61.870(1)). The Attorney General's decision is aptly summarized:

Because discussions between the "Office [of the President of the University of Kentucky] and the administration of the College of Medicine [relating to the implementation of the 1978 University Board of Trustees' approval of 'a geographic full-time medical service plan'] resulted in the formation and incorporation of the Kentucky Medical Services Foundation, Inc.," the Foundation was "established [and] created" by the University and its College of Medicine, both public agencies. Evidence that the University and College of Medicine exercise extensive ongoing "control" of the Foundation through their annual agreements with the Foundation, under the terms of which the University's and/or College of Medicine's approval is required before the Foundation can carry out its business and affairs, supports the conclusion that the Foundation is a public agency for open records purposes pursuant to KRS 61.870(1)(j).

*Id.* at *1 (internal footnote omitted) (brackets original).

Prior to that decision, in a 1982 advisory opinion, OAG 82-216, the Attorney General opined that KMSF was not a public agency for open records purposes pursuant to the part of the Open Records Act now codified at KRS 61.870(1)(h) (defining "public agency" as including entities that received 25% or more of their funding from state or local authority). The opinion did not address the application of any other part of KRS 61.870(1)'s definitions of the term "public agency." *Id.* at *2.

UK appealed *Hatemi, id.*, filing suit December 4, 2015. By its order dated May 29, 2019, the Fayette Circuit Court, in Civil Action No. 15-CI-04417, consolidated with Case Nos. 16-CI-01571, 16-CI-01572, and 16-CI-02474, other *Hatemi/KMSF* Open Records Act cases, ruled that KMSF is a "public agency" subject to the Open Records Act. UK appealed this decision to the Court of Appeals. The Court of Appeals' cases that presented the question whether KMSF is a "public agency" subject to the Open Records Act were dismissed August 3, 2021. At the point Dr. Kearney filed his brief to this Court, he noted that given the Circuit Court's Open Records Act "public agency" opinion, the trial court's and the Court of Appeals' rulings that KMSF is a private corporation beyond the reach of the Whistleblower Act is not a foregone conclusion.

While we do not reach the question whether KMSF is a private corporation beyond UK's control, despite Dr. Kearney's complaint describing the KMSF as a non-profit entity separate and apart from UK, Dr. Kearney's summary judgment response indicates his disagreement with that characterization. It is unclear how the trial court and the Court of Appeals concluded that the KMSF is a private entity and UK administration is not an appropriate body to which reports regarding the need to audit KMSF may be made. Like in the 2015 Attorney General *Hatemi* analysis, UK's control of KMSF would be relevant in an "appropriate body" whistleblower analysis. KMSF being a private corporate entity does not necessarily exclude UK from effectively controlling it. *See, e.g.,* KRS 164A.550(3) (defining an "affiliated corporation" of a postsecondary educational institution as being a corporate entity which is not a public agency and which is organized pursuant to the provisions of KRS Chapter 273 over which an institution exercises effective control, by means of appointments to its board of directors, and which could not exist or effectively operate in the absence of substantial assistance from an institution).

14

UK also argued that even beyond Dr. Kearney's failure to engage in an activity protected under the KWA, he cannot establish a causal connection between his alleged disclosures and the disciplinary action taken against him.

The trial court granted UK summary judgment.[12]  On appeal to the Court of Appeals, Dr. Kearney argued that the trial court erroneously found Professor Jones to be the sole whistleblower, Professor Jones having made the initial disclosure in January 2014; Dr. Kearney's April 2014 disclosure to be a "thought" rather than a disclosure; the report in April 2014 to be solely to the wrongdoers and KMSF to be a private corporation which has no University oversight.  Dr. Kearney also argued that the trial court erred when it found that the disclosure in his complaint was a "bare-bone" legal conclusion and that the Griffith affidavit was filed after the personnel (disciplinary) action concluded. Like the trial court, the Court of Appeals also concluded that none of Dr. Kearney's communications were protected disclosures under KRS 61.102, agreeing with, and supplementing, the trial court's reasoning.

Upon review, we affirm the trial court and the Court of Appeals. Considering the content of the communications, and the timing of the filing of Griffith's affidavit in relation to the salary-related communications from UK, we conclude summary judgment is proper.  Because the content and timing analyses resolve the matter, we do not reach the issues of whether Dr. Kearney

---

[12] The motion for summary judgment was originally heard by Judge John Reynolds, Fayette Circuit Court, Third Division.  This case was subsequently transferred to Judge Ernesto Scorsone, Fayette Circuit Court, Seventh Division. Judge Scorsone held an additional hearing on the motion.

15

communicated the alleged wrongdoings to an appropriate authority and whether KMSF is a private agency for which UK has no oversight.

## ANALYSIS

The primary issue before this Court is whether the trial court and the Court of Appeals correctly concluded that Dr. Kearney's communications, as a matter of law, are not the kind of disclosures covered by the KWA and thus Dr. Kearney's suit against the University must be dismissed. As noted, we find summary judgment for UK was appropriate.

Kentucky Rule of Civil Procedure (CR) 56.03 authorizes summary judgment "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, summary judgment is designed to expedite the disposition of a case when it is clear that a trial is unnecessary, i.e., that a rational trier of fact could not return a verdict for the non-moving party. *Steelvest*, 807 S.W.2d at 480, 482; *Welch v. American Publ'g Co. of Ky.*, 3 S.W.3d 724, 730 (Ky. 1999) (citing *Steelvest*, 807 S.W.2d at 482-83).

Determination that a fact is material or immaterial rests on the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But as CR 56.03 reflects, the inquiry is not simply whether an issue of material fact exists but what facts the parties are able to prove. *See Steelvest*, 807 S.W.2d at 483; *Barton v. Gas Serv. Co.*, 423 S.W.2d 902, 905 (Ky. 1968). An issue of

16

material fact is "genuine" at the summary judgment phase when discovery has revealed facts which make it possible for the non-moving party to prevail at trial. *See Welch*, 3 S.W.3d at 730. Because summary judgment is not a substitute for trial, *Steelvest*, 807 S.W.2d at 483, it should not be granted unless "it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985) (quoting *Roberson v. Lampton*, 516 S.W.2d 838, 840 (Ky. 1974)); *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992) (explaining that when determining the "impossibil[ity] for the respondent to produce evidence" as recited in the summary judgment standard, "impossible" is used in a practical sense, not in an absolute sense). As framed by CR 56.03 then, the movant is entitled to summary judgment when the movant points to evidence of record revealing facts which show it is not possible for the adverse party to prevail. *Welch*, 3 S.W.3d at 730; *see Paintsville*, 683 S.W.2d at 256 (citing *Kaze v. Compton*, 283 S.W.2d 204 (Ky. 1955)).

The party moving for judgment bears the burden of establishing the apparent non-existence of a genuine issue of material fact. *Barton*, 423 S.W.2d at 905. The burden then shifts, and the party opposing summary judgment is obligated to present at least some affirmative evidence to show that a material issue of fact exists for a jury to consider. *Steelvest*, 807 S.W.2d at 482. If, after having an ample opportunity to conduct discovery, a party opposing a properly supported motion for summary judgment fails to controvert the

17

evidence supporting the motion, summary judgment is then proper as there has been no showing of a genuine or real issue of material fact for trial. *Blankenship v. Collier*, 302 S.W.3d 665, 668 (Ky. 2010). With evidence of record being at the heart of a summary judgment decision, summary judgment is proper when the non-movant relies on little more than "speculation and supposition" to support his claims. *See Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 201 (Ky. 2010) (citing *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006)).

When reviewing a summary judgment on appeal, we consider whether the trial court correctly found that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Inter–Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 165 (Ky. 2012); CR 56.03. Because we are only faced with questions of law, we review the opinion of the Court of Appeals de novo. *Id.*

## I. The Trial Court Properly Granted Summary Judgment

### A. The Kentucky Whistleblower Act

The KWA protects disclosures made by "a person acting on his own behalf, or on behalf of another, who reported or is about to report, either verbally or in writing, any matter set forth in KRS 61.102." KRS 61.103(1)(a). Along with describing the matter to which a report must relate in order to qualify as a disclosure, KRS 61.102(1) identifies who must receive the disclosure in order for the disclosure to be considered protected whistleblowing activity. Under KRS 61.102(1),

18

No [governmental[13]] employer shall subject to reprisal, or directly or indirectly use, or threaten to use, any official authority or influence, in any manner whatsoever, which tends to discourage, restrain, depress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any [governmental[14]] employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the Kentucky Legislative Ethics Commission, the Attorney General, the Auditor of Public Accounts, the Executive Branch Ethics Commission, the General Assembly of the Commonwealth of Kentucky or any of its members or employees, the Legislative Research Commission or any of its committees, members or employees, the judiciary or any member or employee of the judiciary, any law enforcement agency or its employees, or any other appropriate body or authority, any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions, or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety. No employer shall require any employee to give notice prior to making such a report, disclosure, or divulgence.

In short, the KWA protects governmental "employees who possess knowledge of wrongdoing that is concealed or not publicly known, and who step forward to help uncover and disclose that information." *Davidson v. Commonwealth, Dep't. of Military Affs.*, 152 S.W.3d 247, 255 (Ky. App. 2004) (quoting *Meuwissen v. Dep't. of Interior*, 234 F.3d 9, 13 (Fed. Cir. 2000)). Because no party to this case disputes that UK is an employer and Dr. Kearney is an employee within this statutory framework, in order for Dr. Kearney to prevail on a KWA claim, it remains for him to prove that 1) he made or attempted to make a good faith report or disclosure of a) facts or information

---

[13] *See* KRS 61.101(2).

[14] *See* KRS 61.101(1).

19

relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance, or b) any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority; 2) to an appropriate body or authority; and 3) UK acted to punish him for making the disclosure or acted in a manner to discourage the making of the disclosure. *See Woodward v. Commonwealth*, 984 S.W.2d 477, 480–81 (Ky. 1998).

*Harper v. University of Louisville*, 559 S.W.3d 796 (Ky. 2018), decided three months after the trial court entered summary judgment in favor of UK, is this Court's most recent whistleblower decision analyzing disclosure content. *Harper,* addressing directed verdict issues, summarizes several principles also useful for determining whether Dr. Kearney's communications are protected whistleblower disclosures which may survive summary judgment. *See id.* at 802-03. First, "[t]he statute protects the whistleblower who exposes information not generally known." *Id.* at 802 (citing *Moss v. Ky. State Univ.*, 465 S.W.3d 457, 460 (Ky. App. 2014)). Second, when the disclosure is not made to one of the entities listed within KRS 61.102(1), it must be made to an "appropriate body or authority" which has the power to remedy or report the perceived misconduct. *Id.* at 802-03 (citing *Gaines*, 276 S.W.3d at 793). Third, an employee's direct complaint to his supervisor concerning the supervisor's own wrongful conduct generally cannot qualify as a whistleblower disclosure. *Id.* at 802 (citing *Pennyrile*, 459 S.W.3d at 345). And fourth, "the nature of the information disclosed cannot simply be an expression of a policy disagreement

20

based upon the whistleblower's subjective opinion; it must objectively meet the criteria for the kinds of misconduct described in the KWA, such as actual or suspected conduct . . . that objectively viewed constitutes waste or fraud." *Id.* at 803 (citing *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).

### B. Claim Alleging Violation of Administrative Regulation

Dr. Kearney views his report of UK's noncompliance with AR 3:14 as a KRS 61.102(1) report of a "violation of any . . . administrative regulation." UK, however, argues that the University's internal administrative regulation is not the same kind or the substantive equivalent of an administrative regulation that KRS 61.102(1) contemplates. Specifically, UK states that AR 3:14 is part of internal university policy, setting rules and requirements within the employment setting. Because KRS 61.102(1) does not define what exactly qualifies as an administrative regulation, UK suggests, citing *Bell v. Bell*, 423 S.W.3d 219, 223 n.12 (Ky. 2014), that the *ejusdem generis* doctrine is the statutory construction rule to resolve any ambiguity in the statute's text. Dr. Kearney agrees that the doctrine is the most appropriate statutory construction rule to apply here but argues that no matter how one may categorize AR 3:14, KRS 61.102(1) also makes "mandates" and "rules" subject to disclosure of actual or suspected violations. He contends that because UK's governing Board of Trustees enacted this provision to mandate how the University must be run, the University's internal regulations carry the full weight of a mandate or rule which can only be altered by the Board of Trustees.

21

When dealing with issues of statutory construction, we begin with the plain text. "The cardinal rule in construing statutes is, if possible, to ascertain the meaning of the Legislature from the language used, and if that be plain, clear, and unambiguous, resort to collateral rules of construction is unnecessary." *Mills v. City of Barbourville*, 117 S.W.2d 187, 188 (Ky. 1938). KRS 446.080(1) provides that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature . . . ." KRS 446.080(4) further provides: "All words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning." When a statute is plain and unambiguous on its face, we are not at liberty to construe the language otherwise. *Whittaker v. McClure*, 891 S.W.2d 80, 83 (Ky. 1995). "Our ultimate goal when reviewing and applying statutes is to give effect to the intent of the General Assembly. We derive that intent from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Commonwealth v. Wright*, 415 S.W.3d 606, 609 (Ky. 2013). We are mindful that "statutes [like the KWA] which are remedial in nature should be liberally construed in favor of their remedial purpose." *Gaines*, 276 S.W.3d at 792 (citing *Kentucky Ins. Guar. Ass'n. v. Jeffers ex rel. Jeffers*, 13 S.W.3d 606, 611 (Ky. 2000)).

22

With its full text presented above, a reminder of KRS 61.102(1)'s particularly pertinent content is sufficient here:

> No employer shall subject to reprisal . . . any employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of . . . [an] appropriate body or authority, any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions . . . .

Unlike UK and Dr. Kearney, we do not find the *ejusdem generis* doctrine applicable to the text at issue. Recently decided *Harper* provides an example of the type of circumstance in which the doctrine does apply. *Harper* relied upon the *ejusdem generis* doctrine to address whether the news media qualified as a recipient of whistleblower information under the generic provision "or any other appropriate body or authority." 559 S.W.3d at 811. *Harper*, relying on *McCarty v. Covol Fuels No. 2, LLC*, 476 S.W.3d 224, 235 (Ky. 2015), stated:

> Our interpretation of the meaning of that phrase is guided by the traditional rules of statutory construction, including the *ejusdem generis* doctrine. *Ejusdem generis* is a rule providing that where a generalization within a statute follows a list of specifically designated subjects or classes of persons, the meaning of the general words will be presumed to be restricted by the particular designation and to include only things or persons of the same kind, class, or nature as those specifically enumerated, unless there is a clear manifestation of a contrary purpose.

559 S.W.3d at 811.

Because KRS 61.102(1) identifies specific bodies to whom a whistleblower report may be given but then provides that a report may be made to "any other appropriate body or authority," the application of the doctrine was clear in that case. *Harper* explained:

23

> The statute plainly lists governmental units and employees within each of the three branches of state government. As desirable as it may be to include newspapers or journalists as repositories of whistleblower reports, the private news media and media outlets bear no resemblance to the class of entities stated in the statute so as to constitute an "appropriate body or authority."

559 S.W.3d at 811.

Because the statute plainly and specifically states that it is applicable to Kentucky's or any of its political subdivisions' administrative regulations, we do not find the *ejusdem generis* doctrine particularly helpful. Rather, the issue presented here is whether UK's "administrative regulation," AR 3:14, is an "administrative regulation" to which KRS 61.102(1) applies.

UK asserts that because KRS 61.102(1) refers to a "law, statute, executive order, administrative regulation, mandate, rule, or ordinance," of the United States, Kentucky or a Kentucky political subdivision, the KWA applies to requirements that are implemented by lawmaking authorities in their lawmaking capacities and have the force of law. UK argues that KRS 61.102(1) does not list, and is clearly not applicable to, internal policies, even those that are labeled an "administrative regulation," like UK's AR 3:14. While we have generally described KRS 61.102(1)'s underlying dual purpose as "to discourage wrongdoing in government, and protect those who make [such wrongdoing] public," *see e.g.*, *Gaines*, 276 S.W.3d at 792, and as dealing with "violations of law," *see e.g., Knott Cnty. Bd. of Educ. v. Patton*, 415 S.W.3d 51, 55 (Ky. 2013), we have never dealt with the specific scope of an "administrative regulation" within KRS 61.102(1).

24

Although it is clear that proper KWA violation reporting goes beyond legislative branch enactments because KRS 61.102(1) also applies to formally created legal directives issued by the executive branch, i.e., executive orders, it is safe to say that some terms used in the statute, i.e., "law," "statute,"—and perhaps "ordinance"—are also commonly recognized by the general public as legislative enactments. Although that may not be so for an "administrative regulation," the term "administrative regulation" likewise has a "peculiar" meaning in law, being used within the branch of law often referred to as administrative law. Administrative law is understood as the "law governing the organization and operation of administrative agencies . . . and the relations of administrative agencies with the legislature, the executive, the judiciary, and the public." *Black's Law Dictionary* (11th ed. 2019). Simply described, administrative law consists of: "(1) the statutes endowing agencies with powers and establishing rules of substantive law relating to those powers; [and] (2) the body of agency-made law, consisting of administrative rules, regulations, reports, or opinions . . . ." *Id.*[15] An officially promulgated administrative regulation is generally recognized as having the force of law and as typically elaborating the requirements of a law or policy. *Id.* (*see* "administrative rule"). KRS Chapter 13A contains Kentucky's statutes regarding the creation of administrative regulations. Given "administrative regulation" has special meaning in the law as codified in KRS Chapter 13A, we must conclude that

---

[15] *Black's Law Dictionary* describes the third part of "administrative law" as "the legal principles governing the acts of public agents when those acts conflict with private rights." *Id.*

25

KRS 61.102(1) refers to an administrative regulation duly promulgated under KRS Chapter 13A, rather than merely an internal administrative rule.

We turn to KRS Chapter 13A, KRS Chapter 164A, and the Kentucky Administrative Regulations (KAR) to determine if UK's AR 3:14 is an administrative regulation recognized by KRS 61.102(1). KRS Chapter 13A, governing the Commonwealth's creation of administrative regulations, defines a) who may promulgate an administrative regulation and b) what a regulation is and is not. KRS Chapter 164A contains statutes related to higher education finance. Finally, the KAR is the compilation of regulations which have been authorized by statute and which follow the rule-making process.

KRS 13A.010(1) defines an "administrative body" as meaning "each state board, bureau, cabinet, commission, department, authority, officer, or other entity, except the General Assembly and the Court of Justice, authorized by law to promulgate administrative regulations." KRS 13A.010(2) then defines "administrative regulation" as meaning "each statement of general applicability promulgated by an administrative body that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any administrative body." After explaining that "the term includes an existing administrative regulation, a new administrative regulation, an emergency administrative regulation, an administrative regulation in contemplation of a statute, and the amendment or repeal of an existing administrative regulation," it pertinently describes things which are not administrative regulations. An administrative regulation does not include

26

"[s]tatements concerning only the internal management of an administrative body and not affecting private rights or procedures available to the public," KRS 131.010(2)(a), or the "[r]ules, regulations, and policies of the governing boards of institutions that make up the postsecondary education system defined in KRS 164.001[16] pertaining to students attending or applicants to the institutions, to faculty and staff of the respective institutions, or to the control and maintenance of land and buildings occupied by the respective institutions," KRS 131.010(2)(e).

KRS 13A.120(1)(a) provides that "[a]n administrative body may promulgate administrative regulations to implement a statute only when the act of the General Assembly creating or amending the statute specifically authorizes the promulgation of administrative regulations or administrative regulations are required by federal law." Within KRS Chapter 164A there is a section related to the financial management of institutions of higher education, KRS 164A.555 to 164A.630. KRS 164A.560 states:

> (1) The governing boards of the postsecondary educational institutions electing to perform in accordance with KRS 164A.555 to 164A.630 regarding the acquisition of funds, accounting, purchasing, capital construction, and affiliated corporations[17,18]

---

[16] This includes the University of Kentucky Board of Trustees.

[17] KRS 164A.550(3) defines an "affiliated corporation" as a

corporate entity which is not a public agency and which is organized pursuant to the provisions of KRS Chapter 273 over which an institution exercises effective control, by means of appointments to its board of directors, and which could not exist or effectively operate in the absence of substantial assistance from an institution.

[18] KRS 164A.610, detailing the organization and operation of affiliated corporations, states:

27

**shall do so by regulation**.  The responsibility for this election is vested with the governing boards, any other statute to the contrary notwithstanding.  The governing board may delegate these responsibilities **by regulation** to appropriate officials of the institution. . . .

(2) The governing boards of institutions may elect to receive, deposit, collect, retain, invest, disburse, and account for all funds received or due from any source including, but not limited to, state and federal appropriations for the support or maintenance of the general operations or special purpose activities of such institutions.  In the event of such election by the governing board:

-------------------

(1) An institution may organize and operate one (1) or more affiliated corporations to assist it in carrying out its programs, missions or other functions.  A qualified firm of certified public accountants experienced in the auditing of colleges and universities and their affiliated corporations shall be engaged to conduct an annual examination of the corporation's financial statements in accord with generally accepted auditing standards for the purpose of rendering an independent opinion thereon and preparing a report of findings and recommendations concerning appropriate accounting controls and compliance with applicable statutes. The affiliated corporation shall adhere to the principles of accounting and purchasing used by the institution with which it is affiliated.

(2) The affiliated corporation shall provide the institution with an accounting at least quarterly, of all income and expenditures of said corporation in connection with contracts or grants with entities external to the institution and the corporation, for the conduct of research or other projects carried out, in whole or in part, through the use of institutional facilities or personnel.

(3) The affiliated corporation shall pay to, or for the benefit of, the institution any and all funds received by it from any person, corporation, association or governmental agency external to the institution and the affiliated corporation as reimbursement for indirect expenses incurred by the institution in carrying out research or furnishing other goods or services, deducting from such payments only the expenses attributable to the procurement and performance of research grants and contracts and other contracts for the provision of such goods and services and such sums as may be essential to meet contractual obligations incurred at the request of the institution's governing board.

As reflected in 765 KAR 1:070, UK has elected to organize and operate one or more affiliated corporations in accordance with KRS 162A.610.  See n.20 below.

28

(a) The treasurer of the institution shall deposit on a timely basis all tuition fees, fees for room and board, incidental fees, contributions, gifts, donations, devises, state and federal appropriations, moneys received from sales and services, admittance fees, and all other moneys received from any source, in a depository bank or banks designated by the governing board.

(b) **The governing board shall promulgate rules and regulations limiting disbursements to the amounts and for the purposes for which state appropriations have been made, or for which other moneys have been received.** All disbursements shall be recorded in a system of accounts as set forth in KRS 164A.555 to 164A.630. The treasurer of each institution shall prescribe forms to be used with the system of accounts, and no treasurer shall approve any disbursement document unless he determines that the disbursement is to satisfy a liability of the institution incurred for authorized purposes and that the disbursement is to be made from the unexpended balance of a proper allotment.

(Emphasis added.)

Under this statute it is clear that the General Assembly recognized UK as an administrative body authorized to promulgate its own particular administrative regulations. Title 765 of the KAR contains promulgated regulations for UK. The seven regulations within Chapter 1, Board of Trustees, are respectively entitled 765 KAR 1:010. Acquisition and disbursement of funds, accounting system – records and annual report;[19] 765 KAR 1:020.

---

[19] 765 KAR 1:010 states:

RELATES TO: KRS 164A.560, 164A.565
STATUTORY AUTHORITY: KRS 164A.560
NECESSITY, FUNCTION, AND CONFORMITY: The governing boards of the public institutions of higher education may elect to perform the financial management functions of KRS 164A.555 to 164A.630 by issuing administrative regulations to do so. This administrative

Delegation of financial management responsibility; 765 KAR 1:030. Annual audit; 765 KAR 1:040. Purchase – inventories – sales of surplus property – capital construction procedures; 765 KAR 1:050. Issuance of bonds; 765 KAR 1:060. Fund for excellence; and 765 KAR 1:070. Affiliated corporations.[20] Thus

---

regulation implements the provisions of KRS 164A.560 and 164A.565 at the University of Kentucky.

Section 1. The University of Kentucky Board of Trustees elects to perform the financial management functions set forth in KRS 164A.560, Section (2), related to the receipt, deposit, collection, retention, investment, disbursement, and accounting of all funds; and KRS 164A.565 related to the installation of and accrual basis accounting system, other records and annual reports.

Section 2. The University of Kentucky Board of Trustees elects to comply with KRS 164A.560, Section (2)(b) to limit disbursements to the accounts and for the purposes for which the state appropriations, or other monies have been received for through the enacting resolution of the institution's annual operating budget.

Section 3. The University of Kentucky Board of Trustees shall use an accrual basis accounting system and fund structure that conforms with generally accepted accounting principles and procedures established for colleges and universities by the National Association of College and University Business Officers and the American Institute of Certified Public Accountants, and shall act to ensure further compliance with Sections (2), (3), (6), (7), and (8) of KRS 164A.565.

[20] 765 KAR 1:070 states:

RELATES TO: KRS 164A.610
STATUTORY AUTHORITY: KRS 164A.560
NECESSITY, FUNCTION, AND CONFORMITY: The governing boards of the public institutions of higher education may elect to perform the financial management functions of KRS 164A.555 to 164A.630 by issuing administrative regulations to do so. This administrative regulation implements the provision of KRS 164A.610 at the University of Kentucky.

Section 1. The University of Kentucky Board of Trustees, under the provisions of KRS 164A.560, elects to organize and operate one (1) or more affiliated corporations in accordance with KRS 164A.610.

under the KWA, Dr. Kearney's "administrative regulation" claim must be premised on these promulgated regulations.[21]  Because it is not evident that any of these Kentucky Administrative Regulations were violated by UK's alleged failure to adhere to AR 3.14, we must conclude that Dr. Kearney's "administrative regulation" communication is not a covered disclosure under KRS 61.102(1).  As to Dr. Kearney's cursory argument[22] that AR 3:14 is a mandate or rule under KRS 61.102(1), because the General Assembly limits administrative regulations which UK may implement through enabling statutes, we believe similar restrictions must exist for instruments referred to as "mandates" or "rules."[23]  Although a university is not commonly recognized as issuing "mandates," currently, a UK "mandate" or "rule" subject to KRS 61.102(1) is in the form of an "administrative regulation," i.e., a KAR.  Given our interpretation of KRS 61.102(1), as a matter of law, we must conclude summary judgment in favor of UK on Dr. Kearney's AR 3:14 communication is proper.

### C. Claim Alleging Fund Mismanagement: April 2014 Meeting

Turning to the April 2014 communication regarding KMSF, the trial court and the Court of Appeals agreed that Dr. Kearney communicated vaguely the "thought" that KMSF needed an audit and did not convey any intent to

---

[21] Because an administrative regulation originates from an enabling statute, a claim may also properly arise from that statute.

[22] The argument consists of three sentences in the reply brief describing AR 3:14 as a mandate or rule.

[23] An "administrative regulation" may be referred to as a "rule" written by an agency.  *Black's Law Dictionary* (11th ed. 2019) (*see* "administrative rule").

31

expose wrongdoing otherwise concealed. Both courts cite *Pennyrile* as authority for their respective decisions.

In *Pennyrile*, we explained,

> Each of the words used in the statute to denote the protected conduct of the employee, "reports, discloses, divulges, or otherwise brings to the attention of . . ." describes behavior that brings to light facts not otherwise known to the recipient. . . . The phrases "in good faith" and "brings to the attention of" clearly denote[] an intent on the part of the employee to reveal or impart what is known to the employee to someone else who lacks that knowledge and, as further discussed below, is in a position to do something about it.

459 S.W.3d at 345.

Dr. Kearney cites *Harper* for the premise that opinion disclosures of suspected waste, mismanagement or abuse of authority are protected under the KWA and cannot be recast as "personal opinions" so as to defeat the Act's protection. Dr. Kearney contends that likewise, viewing the evidence in a light most favorable to him, it was erroneous for the trial court to recast his disclosure as a thought when Dr. Karpf's threat reflected that he, then-UK EVPHA, got the message that Dr. Kearney suspected waste and mismanagement of KMSF funds, amounting to a disclosure of that suspicion. Dr. Kearney also argues that Dr. Karpf's threat shut down Dr. Kearney's attempted disclosure, one that would later be fleshed out in the November 2014 email to UK Associate General Counsel Iler, which listed the unlawful reprisals taken against Dr. Kearney up to that point.

*Harper* states the rule that "the nature of the information disclosed . . . must objectively meet the criteria for the kinds of misconduct described in the

32

KWA, such as actual or suspected conduct that violates a law or administrative regulation or conduct that objectively viewed constitutes waste or fraud." 559 S.W.3d at 803. In *Harper*, a jury agreed that Harper's job was eliminated in retaliation for her numerous complaints to University of Louisville (UofL) officials about suspected wasteful spending. *Id.* at 800. One disclosure at issue involved UofL's spending on a commercial. *Id.* at 805. In keeping with her knowledge and experience, Harper reported a concern that an advertising agency's quote of $100,000 for the commercial was too high and out of line with industry norms for that type of project and provided a recent comparison of $50,000 being spent on a similar commercial. *Id.* Harper expressed concern that an overpayment of that magnitude would waste taxpayer dollars, especially when UofL's programs were being cut back because of budget constraints. *Id.* This Court disagreed with the Court of Appeals and concluded that Harper's disclosure, while perhaps an opinion, was objectively based and that information was relayed to an appropriate UofL official; consequently KRS 61.102's disclosure requirements were met. *Id.* at 806-07.

Harper's disclosure stands in stark contrast to Dr. Kearney's statements made at the April 2014 meeting about the need to audit KMSF. Although not discussing the text of KRS 61.102 which conveys that the disclosure must be objectively based, that is, based upon "facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority," the rule expressed in *Harper* aligns with the statutory text. Here, unlike in *Harper*, Dr. Kearney relayed no objective fact or information supporting the suggestion of

33

misconduct, instead simply saying he thought "we need an independent audit of KMSF." Stated differently, Dr. Kearney did not identify or report certain University actions upon which it was clear he was blowing the whistle. Dr. Kearney, to a certain extent, recognizes this in his argument that he was cut off by Dr. Karpf in that attempted disclosure, but insists he completed the disclosure in the November 2014 email. We conclude that Dr. Kearney's requests for an audit of KMSF, viewed individually or collectively, are not protected disclosures under KRS 61.102.

### D. Claim Alleging Fund Mismanagement: November 2014 Email

The trial court and the Court of Appeals concluded that the November 3, 2014 email was not a report to an appropriate body who could remedy the alleged violation because it was sent to UK's General Counsel office and General Counsel is "alleged to have been involved in the retaliation of which [Dr. Kearney] initially complained from the beginning." As such, Dr. Kearney was not reporting to an entity that lacked the knowledge of the suspected violation.[24] Because we have already determined that the contents of the April 2014 communications do not qualify as protected disclosures, we turn to UK's summary judgment argument that the email is a reiteration of previously reported allegations. Having concluded that Dr. Kearney's communication

_____

[24] In its summary judgment reply, UK disagreed with Dr. Kearney labeling his email as a report because the email was not sent to anyone unaware of Dr. Kearney's April 2014 comments; that is, the email was sent to the University's General Counsel office and General Counsel was present at the April 2014 meeting.

34

concerning AR 3:14 and the unspecified need for an audit of KMSF do not qualify as protected disclosures, we likewise do not view the content of the email to the General Counsel's office as meeting the disclosure requirement. Although Dr. Kearney views the email as publicly disclosing "Dr. Karpf's impropriety i.e., attempting [to] gain control of KMSF practice plan funding contrary to University regulations," the email refers only to violation of UK's internal administrative regulation, not a KAR, and perhaps generally (and vaguely), KMSF fund mismanagement. In sum, the email content is not a protected statement under KRS 61.102(1).

### E. Claim Alleging Violation of Administrative Regulation and Fund Mismanagement: Pleadings and Griffith Affidavit

The trial court and Court of Appeals concluded that the complaint allegation is a bare-bone reiteration of the April 15, 2014 Faculty Council meeting report and as a reiteration of an earlier report fails to be the initial report as required by *Moss*. In regard to the Griffith affidavit, the trial court and the Court of Appeals agreed with UK that chronologically the affidavit filed February 2016 cannot be a report because it came after the alleged retaliation occurred; Dr. Kearney's disciplinary appeals concluded in August 2015.

In the face of the April 2014 and November 2014 communications being rejected as protected disclosures by the lower courts under *Moss* and *Pennyrile* because they were not initial disclosures[25] and were not made to an

_____

[25] The trial court and the Court of Appeals, going beyond UK's summary judgment arguments, found that the Faculty Council's January 2014 discussion was a disclosure. In particular, the trial court gleaned that Professor Jones was the person at the January meeting reporting that the PPC had not met since its creation in 2009,

appropriate authority, Dr. Kearney cites *Davidson* and pivots to argue that his complaint and Griffith's affidavit, also part of the court record, are disclosures to an appropriate person, i.e., the judiciary, and there is no evidence the judiciary had prior knowledge of the misconduct reported by Dr. Kearney. Dr. Kearney contends that his reporting behavior followed *Pennyrile*'s guidance and he made the effort to bring his claim to the attention of someone with the power to remedy the mismanagement reported in his pleading. He contends that the lower courts erroneously applied *Pennyrile* when rejecting the disclosures made in the case record as protected because they were not an "initial report." Notably, UK's discussion of *Pennyrile* and *Moss* in its brief agrees with Dr. Kearney's overall point as to the lower court's interpretation of

---

despite the fact that conditions had occurred requiring the PPC to meet. The trial court then, assuming the Faculty Council is a valid authority under the circumstances of this case to whom a disclosure could be made (although it was not in dispute that the Faculty Council did not have such authority), considered that it was Professor Jones, not Dr. Kearney, who made the initial report. Relying on *Moss*, the trial court then concluded that the PPC disclosure was not a protected disclosure. The Court of Appeals, on the other hand, concluded there were other reasons that the statements made during the January 2014 meeting were not protected disclosures. First, relying on *Pennyrile*, the Court of Appeals reasoned that since Dr. Kearney and Professor Jones' statements were recorded in the meeting minutes, they were available and known to Dean de Beer, General Counsel Thro, and Dr. Wilson. Second, since the PPC was not required to meet at any set date or regularity, the statement that it had not met since 2009 was not an accusation of wrongdoing.

In response to the trial court's analysis, Dr. Kearney argued in his Court of Appeals' brief that *Moss* does not hold that the first in-time disclosure trumps subsequent disclosure but stands for the proposition that a disclosure of that which is widely or publicly known does not fall within the Whistleblower Act. But, Dr. Kearney argued, if Professor Jones's January disclosure falls within the Act as the trial court suggests, so does Dr. Kearney's January disclosure under KRS 61.102(2) since Dr. Kearney aided and supported Professor Jones. Unsurprisingly, Dr. Kearney continues to cite KRS 61.102(2)'s "supports, aids, or substantiates" provision to this Court.

36

these cases.[26]  Although we do not rely on *Pennyrile* and *Moss* in our analysis of Dr. Kearney's complaint and the Griffith affidavit as disclosures, we take this opportunity to clarify any confusion arising from the Court of Appeals' opinion. As described earlier, *Moss* holds that the KWA protects the whistleblower who exposes information not generally known, and *Pennyrile* holds that an employee's direct complaint to his supervisor concerning the supervisor's own wrongful conduct generally cannot qualify as a whistleblower disclosure.

In *Moss*, Moss was employed in an accounting position with Kentucky State University (KSU).  465 S.W.3d at 458.  Her claims of alleged waste and mismanagement stemmed from a job assignment; Napier, Moss's supervisor, assigned Moss the job of reconciling accounts receivable, a task Moss claimed was impossible because the accounts had been unbalanced for many years. *Id.*  Moss claimed that her taxpayer-funded salary was wasted when she was tasked with solving the unsolvable problem of reconciling KSU's accounts

---

[26] UK states:

> Again, the rationale underlying *Pennyrile* presumes the reported misconduct is unknown to others beside the wrongdoer.  An employee whose initial report discloses the misconduct to the wrongdoer can still expose the information by making subsequent report to someone else with authority to remedy the issue.  The subsequent report in that instance, since it exposes information that had continued to be unknown, qualifies for whistleblower protection, even though it was not the employee's initial report.  The same analysis, however, does not extend to subsequent reports addressing "generally known" information as in *Moss* . . . .  Reports regarding generally known information— regardless whether the information was reported once, twice, or more— are not exposing any misconduct to further the law's purpose and do not qualify for whistleblower protection for that reason.

UK, however, goes on to state that Dr. Kearney's focus on *Pennyrile* was misplaced because the rulings below in denying whistleblower protection to Dr. Kearney's civil complaint were based on *Moss,* not *Pennyrile.*

receivable. *Id.* The Court of Appeals concluded that Moss's complaint did not fall under the Whistleblower Act because KSU "was already aware of the problems with reconciling their accounts receivable and financial statements when Moss reported these issues. [KSU] was attempting to address this accounting problem, and thus Moss's complaints were hardly an initial report." *Id.* at 460.

In *Pennyrile*, Rogers was employed by Pennyrile Allied Community Services, Inc. (PACS), a government program focused on rural development. 459 S.W.3d at 341. As part of her job, Rogers went to schools and made presentations. *Id.* Gibbs, Rogers' supervisor, went to Rogers' home to verify that Rogers was working, rather than spending the day at home. *Id.* This Court concluded that Rogers' subsequent visit to a deputy sheriff during which she asked questions concerning property and privacy rights, and during which she did not mention her supervisor, was not a disclosure under KRS 61.102. *Id.* at 344-45. Then, when considering whether Rogers' complaint to Gibbs during a PACS meeting about his visit to her home constituted an "internal disclosure," we again reached the conclusion that Rogers did not make a disclosure under KRS 61.102. *Id.* at 345. First, because Gibbs was well aware of Rogers' complaint, Rogers was not bringing to light facts not otherwise known to the recipient, and second, because there was no one at the meeting with supervisory authority over Gibbs, Rogers could not have been addressing the comments to someone in a position to bring corrective action. *Id.* We noted that "Rogers made no effort to bring her claim to the attention of anyone

38

with the power to remedy or report Gibbs's behavior" and concluded that "[a]n otherwise at-will employee cannot gain whistleblower status, and the protections that come with that status, by simply complaining to her boss about what she perceives as his misconduct." *Id.* at 346.

In its opinion in this case, the Court of Appeals stated:

In order to be protected under KRS 61.102, an alleged disclosure must be an initial report, not repeated or subsequent reports. *See Moss v. Kentucky State University*, 465 S.W.3d 457, 460 (Ky. App. 2014); *Pennyrile*, 459 S.W.3d at 345 (tacitly recognizing that repeated disclosures are not protected under the Whistleblower Act since KRS 61.103(1)(a) requires a disclosure "bring[] to light facts not otherwise known to the recipient").

Simply put, we do not read *Moss* or *Pennyrile* as foreclosing a repeated or subsequent report from ever being a disclosure under the KWA. Depending on the circumstances, a repeated report up the chain of command or to another appropriate authority who could remedy the complaint may qualify as a disclosure.

Returning to the content of the complaint, Dr. Kearney alleges he disclosed to UK officials in attendance at the April 2014 meeting, along with other Faculty Council members, that UK officials violated University AR 3:14, by failing to create a functioning PPC for a period of four years. He also alleges that he requested an independent audit of KMSF as well as an outside investigation by an independent law firm. He further alleges that university administrators, particularly Dr. Karpf, were mismanaging KMSF funds in violation of university regulations, in an abuse of their authority and in violation of law. Because we found in the preceding analysis that the April

39

2014 meeting statements, and similarly the November 2014 email statements, do not meet KRS 61.102(1) disclosure requirements, we likewise conclude that Dr. Kearney's complaint, its allegations relying on the April and November statements, does not meet KRS 61.102(1) disclosure requirements. Hence, without Dr. Kearney making protected disclosures, Dr. Kearney's loss of clinical privileges cannot be viewed as retaliation under the KWA. Consequently, the only question remaining is whether there is a genuine issue of material fact under the KWA related to the Griffith affidavit.

The Griffith affidavit filed in the court record is different from Dr. Kearney's complaint allegations. Griffith provided detailed spending information as to KMSF funds, such as the financing of the Child Development Center's new building and its annual operating expenses in excess of $100,000 and loaning the Center a sum in excess of $5 million; loaning a pharmaceutical company in excess of $400,000; and as mentioned earlier, leasing a plane and contracting for a pilot's services. While the affidavit may be considered objective support of alleged misconduct, here, we conclude that even if Dr. Kearney made a report to an appropriate authority through the placement of Griffith's affidavit into the court record, a genuine issue of material fact does not exist as to the affidavit disclosure being a contributing factor in Dr. Kearney's salary reduction.[27]

---

[27] Although Dr. Kearney maintains his amended complaint was a part of the disclosure leading to UK's retaliation, Dr. Kearney experienced the pay cut before the amended complaint was filed in September 2016.

Under the KWA, any covered disclosure must be shown by a preponderance of the evidence to be a contributing factor in the personnel action. KRS 61.103(3). KRS 61.103(1)(b) defines "contributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of a decision." KRS 61.103(1)(b) further provides that "[i]t shall be presumed there existed a 'contributing factor' if the official taking the action knew or had constructive knowledge of the disclosure and acted within a limited period of time so that a reasonable person would conclude the disclosure was a factor in the personnel action."

> Once a prima facie case of reprisal has been established and disclosure determined to be a contributing factor to the personnel action, the burden of proof shall be on the agency to prove by clear and convincing evidence that the disclosure was not a material fact in the personnel action.

KRS 61.103(3).

Dr. Kearney points out that three months after he filed the Griffith affidavit, UK reduced his salary substantially, which he views as evidence that reprisals continued against him. Dr. Kearney states that because Dean de Beer and General Counsel Thro had either actual or constructive knowledge of the Griffith affidavit disclosure, and his pay was cut a short time after he placed the affidavit in the court record, he enjoys the presumption under KRS 61.103(1)(b) that the filing of the affidavit was a "contributing factor" in the pay cut, an adverse job action. UK, on the other hand, responds that Dr. Kearney improperly fails to account for all the facts leading up to the pay cut, facts which undercut any potential whistleblower claim. UK details that when the

41

affidavit was filed in February 2016, a review of Dr. Kearney's compensation in light of his reduced duties was "in the works."

The disciplinary proceeding against Dr. Kearney concluded August 24, 2015. General Counsel Thro communicated with Dr. Kearney in writing August 28, 2015, and among other things, advised that his compensation was under review. UK sent additional letters on October 24, 2015;[28] November 11, 2015;[29] and December 23, 2015,[30] all before Dr. Kearney filed Griffith's affidavit in the court record on February 10, 2016. UK then sent other letters

[28] The October 24, 2015 letter, discussing employment options, stated that Dr. Kearney would have to undertake research and service activities as a full-time tenured faculty member sufficient to justify his then annual salary of $350,000. UK stated to that end, the College of Medicine Dean was prepared to work with Dr. Kearney so that he would be positioned to do so, including facilitating his ability to generate external research dollars. The letter continued, stating, that because Dr. Kearney's duties no longer included teaching or generating clinical income for the University, his base salary likely would have to be adjusted to reflect his existing and potential contributions to the University's missions and the University would keep him informed as any decisions were made.

[29] The November 11, 2015 letter stated that because Dr. Kearney no longer had clinical privileges, it was necessary to redefine Dr. Kearney's "Distribution of Effort." Reiterating the University's willingness to work with Dr. Kearney to position him for success as a funded researcher, the letter informed Dr. Kearney that in advance of a meeting with Dean de Beer he should submit to the Dean by December 1 a detailed plan for making future contributions to the University in general and for becoming a productive researcher in particular. The letter then stated, "Of course, Dr. Kearney's salary in both the short- and long-term will reflect his research and service contributions."

[30] The December 23, 2015 letter stated that when Dean de Beer met with Dr. Kearney on December 10, Dr. Kearney informed the Dean he would not comply with the request to submit a detailed plan and his lawyer would be responding. The University explained that tenured faculty members are expected to make significant contributions to the University and to work with their Dean to develop a distribution of effort. The University stated its expectation for Dr. Kearney to submit to the Dean by January 18, 2016 a detailed plan for making future contributions to the University in general and for becoming a productive researcher in particular. The University stated that if Dr. Kearney failed to do so, it would immediately review his salary and his status as a tenured faculty member.

on February 17, 2016[31] and March 24, 2016,[32] to establish Dr. Kearney's new role at UK. Dr. Kearney contends that he submitted research and service plans that were rebuffed by Dean de Beer. UK on the other hand, states that Dr. Kearney did not engage in these efforts and failed to provide a sufficient plan, and UK sent notice of his salary reduction on April 20, 2016.[33]

We agree with UK that its consistent communications to Dr. Kearney about salary adjustment and research funding expectations before and after the filing of the affidavit totally undermine KRS 61.103(1)(b)'s "contributing factor" presumption. *Cf. Harper*, 559 S.W.3d at 804 (holding that Harper

---

[31] The February 17, 2016 letter was limited to a discussion of Dr. Kearney's salary. It stated that because Dr. Kearney no longer generates clinical income for the University, Dr. Kearney's salary should reflect his expected contributions as a M.D. who holds an appointment as a regular title series tenured professor in a basic science department of the College of Medicine and advised that the Provost had accepted the $133,713 salary recommended by the Dean for Dr. Kearney, and that Dr. Kearney's reduced salary would begin March 1. The letter also stated that Dr. Kearney had yet to submit a plan that meets the Dean's expectations of detail and clarity, and that should Dr. Kearney be unwilling or unable to develop a significant research agenda with appropriate external funding, the University would further adjust his salary to reflect his contributions.

[32] The March 24, 2016 letter stated that despite repeated requests, Dr. Kearney had yet to submit a plan that met the Dean's expectations of detail and clarity. The University informed Dr. Kearney that he must submit a plan, meeting the specifications contained in the letter, by April 8, and if he did not do so, the University would regard the failure as a reason to further evaluate Dr. Kearney's salary. The letter ended stating, "If the University is to continue to pay Dr. Kearney a salary consistent with his peers, then Dr. Kearney must perform at a level consistent with his peers."

[33] The April 20, 2016 letter stated that to date, Dr. Kearney had failed to submit a plan that met the Dean's expectations of detail and clarity, and that he had made no effort to contribute to the University during the 2015-16 academic year. The University stated that as part of its consideration of whether to commence tenure revocation proceedings, one step it was taking was reducing Dr. Kearney's salary appropriately (to $43,500), it being fundamentally unfair to pay Dr. Kearney more than his peers who were actually contributing. The salary reduction was effective May 1, 2016.

43

enjoyed the benefit of the statutory presumption, given the elimination of Harper's position was announced immediately upon the heels of her last wasteful spending disclosure). Consequently, as Dr. Kearney acknowledges, the question becomes whether he has put forth some evidence which reasonably supports his contention that filing the Griffith affidavit in the court record was a contributing factor to the ultimate reduction in his salary three months afterward, allowing him to survive summary judgment. Because Dr. Kearney cannot simply rely on the fact that the affidavit was filed and three months afterward his pay was cut (again), and he points to no other evidence upon which a reasonable person could conclude that his pay cut was retaliation for filing the Griffith affidavit in the court record, we conclude that Dr. Kearney has not met his burden to survive summary judgment. Simply put, Dr. Kearney fails to establish a genuine issue of material fact that disclosing the alleged KMSF fund mismanagement through the filing of the affidavit was a contributing factor in his salary reduction. Summary judgment is also appropriate on this claim.

## II. Discovery Issue

The remaining issue in this appeal is whether the trial court abused its discretion by prohibiting Dr. Kearney from deposing Dr. Wendy Hanson, a member of the Fair Hearing Panel. Dr. Kearney sought to depose her to determine how and from whom the Panel secured information that Dr. Kearney had multiple remediation actions, reprimands, leaves of absences and warnings during his twenty-seven years at the University. UK responded

44

claiming the deliberative process privilege prevented the discovery and the trial court agreed. Dr. Kearney continues to argue the privilege is not recognized in Kentucky. Like the Court of Appeals, we decline to address the issue further because Dr. Kearney does not suggest, much less explain, how his substantive rights were prejudiced by the trial court's denial of his motion to depose a member of the Fair Hearing Panel. As noted, we are affirming the trial court and Court of Appeals on the summary judgment decision based upon the content and timing of Dr. Kearney's communications, resulting in a dismissal of his case. We decline to issue an advisory opinion on this issue which has no bearing on the disposition of this case. *Newkirk v. Commonwealth,* 505 S.W.3d 770, 774 (Ky. 2016).

## CONCLUSION

For the foregoing reasons, the Court of Appeals' decision affirming the trial court's grant of summary judgment in favor of the University of Kentucky is affirmed.

Minton, C.J.; Conley, Keller, Nickell, and VanMeter, JJ., sitting. All concur. Lambert, J., not sitting.

COUNSEL FOR APPELLANT:

Bernard Pafunda
Pafunda Law Office


COUNSEL FOR APPELLEE:

Bryan Howard Beauman
Donald Callaway Morgan
Sturgill Turner Barker & Moloney PLLC